## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Nefertiti Gilbert, as Personal Representative of Jaleen Anderson, deceased, and on her own behalf, and on behalf of her minor child A.G.; | |
| Christi Jackson, on behalf of her minor children X.A. and J.A.; | |
| and | |
| Jyrie Polk, on behalf of her minor child A.A., | |
| Plaintiffs, | |
| v. | Case No. |
| Harris County, Texas; | |
| Ed Gonzalez, in his individual and in his official capacities; | JURY TRIAL DEMANDED |
| LaSalle Correctional Center, L.L.C.; | |
| LaSalle Corrections, L.L.C.' | |
| LaSalle Management Company, L.L.C.; | |
| Clay McConnell, in his individual and in his official capacities; | |
| William McConnell, in his individual and in his official capacities; | |
| John Stuckey, in his individual and in his official capacities; | |
| Paul Smith, in his individual and in his official capacities; | |
| Lieutenant Morehead, in his individual and in his official capacities; | |

1

Pamela Hearn, in her individual and in her official capacities;

Charlotte Fussell, in her individual and in her official capacities;

Shannon Brewer, in her individual and in her official capacities;

Gwen Warren, in her individual and in her official capacities;

Denise Finlay, in her individual and in her official capacities;

and

Mariah Dickey, in her individual and in her official capacities,

Defendants.

## COMPLAINT

For their Complaint, Plaintiffs Nefertiti Gilbert, as Personal Representative of Jaleen Anderson, deceased, Christi Jackson, and Jyrie Polk, by and through their attorneys, Romanucci and Blandin, LLC, and Maples Connick, LLC, state as follows:

## INTRODUCTION

"We don't send people to the hospital for seizures." That is what on-call nurse Denise Finlay told guards during the evening of April 3, 2024, at a private jail operated by LaSalle Corrections in Olla, Louisiana. The guards had called Nurse Finley for permission to summon an ambulance because Jaleen Anderson, a 29-year-old detainee, was suffering from escalating seizures that left him unable to get up from his bunk, which at this point was covered in his urine and vomit.

Mr. Anderson had been suffering seizures for more than a day, but even though guards repeatedly called "code blue" emergencies for him, one nurse after another brushed them off, making no effort to determine why Mr. Anderson kept having the seizures or whether he was in danger. Around an hour after Nurse Finlay's declaration, Mr. Anderson would be dead.

Mr. Anderson was a resident of Houston, Texas.  He was being held in Louisiana because Harris County, Texas, outsourced the jailing if many detainees to a private prison company called LaSalle Corrections.  By shipping people to a private jail in Louisiana, Harris County avoided oversight by the Texas Commission on Jail Standards, which regulates jails in the state to ensure that Texas residents in jail receive humane treatment, including adequate medical care.  That lack of oversight should have been cause for alarm, because LaSalle Corrections has a long and troubling history of failing to provide adequate medical care to people it detains, even people with serious medical conditions like Mr. Anderson's.  Harris County was on notice about this troubling track record, yet it continued to ship out people in its custody to LaSalle, and to other private prison companies with similar track records.

Mr. Anderson's family brings this lawsuit to hold accountable the medical and administrators at the Olla jail who ignored Mr. Anderson's needs and refused to get him treatment.  Plaintiffs also sue LaSalle Corrections, and its owners, for its indifference to the medical needs of people like Mr. Anderson. And Plaintiffs sue Harris County and Harris County Sheriff Ed Gonzalez, who cannot outsource the County's non-delegable duty to ensure that Mr. Anderson and other Harris County

detainees are housed in humane conditions while they are in the County's custody. Mr. Anderson's death was entirely preventable, and he leaves behind a grieving family. By bringing this lawsuit, his family seeks redress for that harm and seeks to deter jailors from doing to someone else what the defendants did to Mr. Anderson.

## JURISDICTION

1.  This is a civil rights action arising under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343.

2.  The Court additionally has subject matter jurisdiction over Plaintiffs' state law claims under 42 U.S.C. § 1367 as those claims arise from the same transaction and occurrence as Plaintiffs' federal claims.

3.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because one or more of the Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## PARTIES

### A.    The plaintiffs.

4.  Nefertiti Gilbert is the widow of the decedent, Jaleen Anderson. She is the Personal Representative of Jaleen Anderson, deceased. In her representative capacity, she brings this action on behalf of all beneficiaries.

5.  Nefertiti Gilbert also brings this action in her personal capacity on her own behalf as Mr. Anderson's widow, to recover damages sounding in wrongful death.

4

6.    Nefertiti Gilbert is the mother of Mr. Anderson's 11-year-old daughter, A.G.  Ms. Gilbert brings this action on the child's behalf to recover damages sounding in wrongful death.

7.    Christi Jackson is the mother of Mr. Anderson's 5-month-old daughter, J.A., and 17-month-old daughter, X.A., and brings this action on each child's behalf to recover damages sounding in wrongful death.

8.    Jyrie Polk is the mother of Mr. Anderson's four-year-old son, A.A., and brings this action on the child's behalf to recover damages sounding in wrongful death.

**B.    The municipal defendants.**

9.    Defendant Harris County is a governmental entity and a political subdivision of the state of Texas.

10.    Ed Gonzalez is the Sherif of Harris County, Texas.  He is sued in his official and individual capacities.  In his official capacity, Sheriff Gonzalez is included in all references to "Harris County."

11.    Harris County and Sheriff Gonzalez have outsourced the confinement of numerous people in their custody who are awaiting trial to private jailors, including Defendant LaSalle.

12.    Harris County and Sheriff Gonzalez have a non-delegable duty to ensure that all people the custody of Harris County, including people whose detention it outsources to private jailors like LaSalle, receive adequate medical care and humane conditions of confinement as mandated by the U.S. Constitution and Texas law.

**C.     The corporate defendants.**

13.     Defendant LaSalle Correctional Center, L.L.C. is a private entity.  On information and belief LaSalle Correctional Center, L.L.C. owns and operates the La Salle Correctional Center in Olla, Louisiana ("Olla LCC"), where Mr. Anderson was detained when he died.

14.     LaSalle Corrections, L.L.C. is a private entity that, on information and belief, maintains, manages, and operates at least eighteen jails throughout the states of Louisiana, Texas, Mississippi, and Georgia, including the Olla LCC.

15.     LaSalle Management Company, L.L.C. is a private entity responsible for the operations and employees at various LaSalle facilities, including the Olla LCC.

16.     Collectively and individually, LaSalle Correctional Center, L.L.C., LaSalle Corrections, L.L.C., and LaSalle Management Company, L.L.C. are referred to in this complaint as "LaSalle".

17.     LaSalle has a duty to ensure that all the people in its custody receive adequate medical care.

18.     Defendant Clay McConnell and Defendant William McConnell are the owners of LaSalle and additional corporate entities affiliated with LaSalle.  They are sued in their individual and in their official capacities.

19.     Defendant Clay McConnell and Defendant William McConnell exercise ultimate control over and policymaking authority regarding LaSalle's policies and practices as described herein.

**D.     The individual defendants.**

20.     John Stuckey is the Warden of the Olla LCC. He is sued in his individual capacity and in his official capacity.

21.     Paul Smith was Assistant Warden of the Olla LCC. He is sued in his individual capacity and in his official capacity.

22.     Defendant Lieutenant Morehead was a correctional officer at the Olla LCC. He is sued in his individual capacity and in his official capacity.

23.     Pamela Hearn, M.D. is the Medical Director for LaSalle and the medical director of the Olla LCC. She is sued in her individual capacity and in her official capacity.

24.     Charlotte Fussell was the Health Service Director of the Olla LCC. She is sued in her individual capacity and in her official capacity.

25.     Shannon Brewer is a Nurse Practitioner who was responsible for medical care of detainees and/or inmates in the Olla LCC. She is sued in her individual capacity and in her official capacity.

26.     Gwen Warren is a Licensed Professional Nurse who was responsible for medical care of detainees and/or inmates in the Olla LCC. She is sued in her individual capacity and in her official capacity.

27.     Denise Finlay is a Licensed Professional Nurse who was responsible for medical care of detainees and/or inmates in the Olla LCC. She is sued in her individual capacity and in her official capacity.

28.     Officer Mariah Dickey is a correctional officer for LaSalle with no license or training in any medical category. She is sued in her individual capacity and in her official capacity.

29.     In the events described in this complaint, each defendant named in this complaint acted within the scope of their employment and under color of law.

## FACTS COMMON TO ALL COUNTS

### E.     Mr. Anderson's detention in Harris County and his transfer to LaSalle's Olla LCC.

30.     At the time of his death, Jaleen Anderson was a 29-year-old resident of Houston, Texas.

31.     On March 3, 2024, Mr. Anderson was arrested in Houston and charged with possession of an illegal substance.

32.     He was brought to the Harris County jail in Houston, Texas, where he was detained awaiting adjudication of the charge.

33.     Harris County has an outsourcing contract with LaSalle to jail people who are imprisoned by Harris County while they await trial.

34.     Pursuant to that contract, on March 22, 2024, Mr. Anderson was transferred from the Harris County jail to the Olla LCC.

35.     After arriving at Olla LCC, Mr. Anderson was placed in a large dorm room with approximately 100 open bunks.

### 1.     Morning of April 2.

36.     On April 2, 2024, at around 6:03 AM, while Mr. Anderson was in his bunk, he had a seizure.

37.     Fellow detainees in the dorm room alerted guards to Mr. Anderson's condition, and a "code blue" was called.

38.     A "code blue" is an alert used for medical emergencies.

39.     A seizure is a serious medical condition.

40.     Seizures can cause death or serious disability.

41.     Seizures can be symptoms of one or more medical conditions that can cause death or serious disability.

42.     When a person has a seizure, they should be assessed by a medical professional for the purpose of determining whether the person has a serious medical condition caused by or indicated by the seizure.

43.     Defendant LPN Gwen Warren responded to the code blue, where she noted that Mr. Anderson had urinated on himself.

44.     Defendant LPN Gwen Warren did not attempt to provide medical care for Mr. Anderson

45.     Defendant LPN Gwen Warren did not attempt to obtain a medical assessment or a diagnosis for the cause of the seizure.

46.     Defendant LPN Gwen Warren did not attempt to alert a doctor or equivalent medical practitioner about the seizure.

47.     Instead, Mr. Anderson was taken to the bathroom to shower, and was then returned to his bunk.

### 2.    Morning of April 3.

48.    On April 3, 2024, at around 6:01 AM, Mr. Anderson had another seizure while sitting at a table near his bunk, and he fell to the floor.

49.    Fellow detainees alerted guards of Mr. Anderson's condition.

50.    Following this seizure, a code blue was called, and Mr. Anderson was escorted to Olla LCC's medical clinic.

51.    A person suffering multiple seizures can be an indication that the person has a serious medical condition that can cause death or serious disability.

52.    When a person has multiple seizures, they should be assessed by a medical professional for the purpose of determining whether the person faces a health risk caused by or indicated by the seizures.

53.    Mr. Anderson waited in the clinic for nearly four hours before being seen by a medical professional, Defendant NP Shannon Brewer.

54.    Defendant Brewer did not order Mr. Anderson's transport to the hospital.

55.    Defendant Brewer did not attempt to provide medical care for Mr. Anderson.

56.    Defendant Brewer did not attempt to obtain an assessment or a diagnosis for the cause of Mr. Anderson's seizures.

57.    Defendant Brewer did not attempt to provide treatment for Mr. Anderson's seizures.

58.     Instead, Defendant Brewer ordered that Mr. Anderson be placed on in a "medical observation" cell.

59.     From 10:34 AM to 5:39 PM, Mr. Anderson remained alone in a medical observation cell, which was not equipped with a camera.

60.     An Olla LCC detainee on medical observation is placed in a cell alone, with the door closed.

61.     The monitoring of medical observation cells consists of guards periodically making rounds in which they glance into the cells without any evaluation of the individual's well-being.

62.     Medical observation cells are almost always monitored by guards who lack adequate medical training or experience.

**3.     5:00 PM on April 3.**

63.     Shortly before 5:39 PM on April 3, 2024, Mr. Anderson suffered another seizure.

64.     During this seizure, Mr. Anderson vomited and urinated on himself.

65.     Despite being on medical observation, no correctional officer or medical staff provided medical care or treatment to Mr. Anderson during his seizure.

66.     After the seizure, Mr. Anderson knocked on the cell of his door and informed the guard who responded that he had suffered another seizure.

67.     Mr. Anderson was then escorted to a restroom to "wash up" and get a change of clothes.

68.     As he was being escorted, Mr. Anderson lowered himself to the ground while appearing in visible pain, rested his hand on the guards to steady himself, and required physical support from guards to walk down the hallway.

69.     While in the restroom, at approximately 5:41 PM, Mr. Anderson had yet another seizure, and a code blue was called.

70.     Lieutenant Charles Love, Officer Brandon Cotherman, Officer Detrick Street, and Defendant Mariah Dickey responded to the code blue.

71.     Mr. Anderson was placed in a wheelchair.

72.     Following the code blue, Defendant Dickey called Defendant LPN Denise Finlay on the phone and told her that Mr. Anderson had suffered more seizures.

73.     Defendant Finlay told Defendant Dickey that Mr. Anderson was faking and instructed Defendant Dickey to put Mr. Anderson back in his cell.

74.     Defendant Finlay is not a doctor.

75.     Defendant Finlay did not have the training or knowledge to determine whether Mr. Anderson's reported symptoms were the result of malingering or were actually a serious medical condition.

76.     Defendant Finlay made no attempt to determine the cause of Mr. Anderson's seizures or to determine whether they indicated a risk to his health.

**4.      6:00 PM on April 3.**

77.     At approximately 5:58 PM, on April 3, Mr. Anderson was wheeled to a medical observation cell that was equipped with a camera—Cell 101.

78.    When he arrived in Cell 101, Mr. Anderson was sitting in his wheelchair, breathing heavily with his hand on his chest.

**5.    7:00 PM on April 3.**

79.    At around 7:05 PM, Mr. Anderson began to vomit while in his bunk and suffered another seizure.

80.    Mr. Anderson vomited for thirty seconds, continuously, on camera, but no staff member came to his aid.



81.    After he finished vomiting, Mr. Anderson rose from his bunk, stumbled toward the door, and knocked on it repeatedly.

82.    Mr. Anderson appeared visibly disoriented on camera.

83.    At 7:11 PM, Sergeant Raspberry responded to Mr. Anderson's cell, spoke with him briefly through the window of the cell, and walked away.

84.     Mr. Anderson then collapsed on the floor of Cell 101.

85.     As Mr. Anderson moved on the floor, apparently unable to get up, he waved at the camera for help. Mr. Anderson continued to sit on the floor in visible distress, breathing heavily, and unable to lift himself up.

86.     At 7:13 PM, Mr. Anderson lay on the concrete floor in visible distress and breathing heavily.

87.     At 7:15 PM, guards arrived and tried to get Mr. Anderson off the floor.

88.     At approximately 7:16 PM, guards were able to sit Mr. Anderson up from the laying position, but he was visibly disoriented and distressed.

89.     A code blue was called, and the reporting officers noted that Mr. Anderson's bunk was soaked and the vomit on the floor contained blood.

90.      As he sat up, Mr. Anderson clung to one of the guard's arms to steady himself until a wheelchair arrived.



91.    One of the guards had to lift Mr. Anderson into the wheelchair.

92.    As guards wheeled him out of Cell 101, Mr. Anderson sat in a coiled position in the wheelchair, with his legs tucked into his arms, appearing visibly distressed.



93.    Mr. Anderson was then wheeled back to the Olla LCC medical clinic where Defendant Dickey again called Defendant Finlay.

94.    Defendant Finlay told Defendant Dickey that they would not send Mr. Anderson to the hospital for the seizure.

95.    Instead, Defendant Finlay instructed Defendant Dickey to give Mr. Anderson 50 mg of Zoloft and return him to his cell.

96.    After Deputy May procured a wheelchair, Deputy May, Deputy Dakota King, Sergeant Raspberry, and Lieutenant Charles Love escorted Mr. Anderson from the cell to an observation cell with no camera, in the medical clinic area.

97.    While Mr. Anderson was being transported to the medical clinic, he suffered more episodes of vomiting and more seizures.

98.    Another code blue was called at 7:35 PM.

99.    Nurse Finlay was notified several times of Mr. Anderson's seizures.

100.    At approximately 7:47 PM, as Mr. Anderson was suffering another seizure, Nurse Finlay, over the phone, told Officer Dickey that inmates are not sent to the hospital for seizures.  Officer Dickey relayed this statement to Lieutenant Love.

101.    Lieutenant Love told Defendant Dickey that if Mr. Anderson was put back in the cell, he would continue to have seizures.

102.    Sergeant Raspberry and Lieutenant Love then called Defendant Finlay directly to authorize EMS, but Defendant Finlay told them: "We don't send people to the hospital for seizures."

103.    Lieutenant Love called on duty warden, Defendant Lieutenant Morehead, to notify him of the situation.

104.    Notwithstanding Defendant Finlay's plainly improper instruction, Lt. Morehead told the guards that they must follow Finlay's instructions.

105.    Lieutenant Morehead also called Defendant Assistant Warden Paul Smith.

106.    Defendant Assistant Warden Smith was the highest-ranking staff member who was contacted about Mr. Anderson's seizures and his not being sent to the hospital.

107.    Defendant Assistant Warden Smith refused to authorize Mr. Anderson to be sent to the hospital.

108.    Defendant Assistant Warden Smith and/or Defendant Morehead instructed Lt. Love to put Mr. Anderson back in the cell, keep a close eye on him, and, if he got worse, "do what [Lt. Love] think[s] needs done."

109.    On information and belief, neither Defendant Assistant Warden Smith and/or Defendant Morehead had medical training for evaluating or treating seizures.

110.    Nobody took Mr. Anderson to the hospital or to see a medical doctor about his seizures.

### 6.    8:00 PM on April 3

111.    At 8:03 PM, Mr. Anderson began to convulse, vomit, and lose consciousness.

112.    Deputy King and Deputy May called a code blue.

113.    Sergeant Raspberry tried to wake Mr. Anderson using an ammonia strip.

114.    Defendant Dickey laughed as she stood over an unresponsive Mr. Anderson.

115.    At the same time, officers were attempting unsuccessfully to locate a pulse on Mr. Anderson.

116.    At 8:13 PM, Lieutenant Love called an ambulance for Mr. Anderson.

117.    At 8:22 PM EMS arrived. When EMS reached him, Mr. Anderson was unresponsive on the floor.

118.    After Mr. Anderson, still motionless, was loaded on to the gurney, EMS could not locate a pulse and began chest compressions.

119.  At 8:26 PM, Defendant Dickey spoke with Defendant Fussell, who told Defendant Dickey that Mr. Anderson was faking his symptoms. Defendant Fussell further explained that she and Defendant Shannon Brewer had evaluated Mr. Anderson earlier that day, that he was fine, and that he was going to stay up all night having seizures. She instructed Defendant Dickey not to send Mr. Anderson to the hospital.

120.  Neither Defendant Fussell nor Defendant Shannon Brewer is a medical doctor.

121.  Neither Defendant Fussell nor Defendant Shannon Brewer made reasonable medical efforts to determine whether Mr. Anderson's reported symptoms were the result of malingering or whether they indicated that Mr. Anderson had a serious medical condition.

122.  Neither Defendant Fussell nor Defendant Shannon Brewer made reasonable medical efforts to determine that afternoon whether Mr. Anderson was fine or whether he suffered from a medical condition that required care.

123.  At 8:29 PM, Mr. Anderson, while still receiving chest compressions, was loaded into the ambulance and taken to Hardtner Medical Center, in Olla Louisiana.

124.  At 8:59 PM, Mr. Anderson was pronounced dead.

125.  During the course of the foregoing events Mr. Anderson suffered severe physical and emotional pain and emotional distress.

## F.      LaSalle's policy of providing inadequate medical care.

126.    The failure to provide Mr. Anderson with appropriate medical care was driven by the policies and practices of Defendant LaSalle, which permit and tacitly endorse such unlawful treatment.

127.    At all times relevant to the events at issue in this case, Defendant LaSalle contracted with the multiple jailors, including Harris County, to house and to provide healthcare to people housed in various LaSalle jails.

128.    Having taken custody of such detainees, LaSalle was responsible for ensuring that they received adequate medical care.

129.    As the provider of healthcare services, LaSalle was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to people in its custody, including people in custody at the Olla LCC.

130.    Prior to the events giving rise to Plaintiff's Complaint, Defendant LaSalle had notice of widespread policies and practices by healthcare and correctional staff at Olla LCC and throughout jails operated by LaSalle pursuant to which people in custody like Mr. Anderson with serious medical needs were routinely denied medical care and access to medical care.

131.    It is common within LaSalle facilities, including the Olla LCC, to see detainees and prisoners with clear symptoms of serious medical needs whose medical records reflect an obvious need for treatment whose medical treatment are routinely delayed or completely ignored by healthcare and correctional employees.

132.    Despite knowledge of these unlawful policies and practices, Defendant LaSalle did nothing to ensure that detainees and prisoners in LaSalle jails received adequate medical care and access to medical care, thereby acting with deliberate indifference.

133.    Specifically, there exist policies or widespread practices within LaSalle jails pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or follow up on complaints by detainees and prisoners about their health status; (2) detainees are left in "observation" cells where no care or assessment is provided; (3) healthcare personnel fail to follow appropriate diagnostic procedures, favoring instead cheaper procedures even if they are demonstrably ineffective; (4) healthcare personnel fail to take action to secure appropriate continuity of care for complicated and urgent conditions; (5) low-level nurses, including licensed vocational nurses and licensed practical nurses, are allowed to practice outside of their medical licenses and address life-threatening ailments that they are not licensed or qualified to assess or to treat; (6) guards are under-trained, and are not trained regarding their obligations with respect to medical care, and are instructed not to seek outside medical care so long as a detainee is alive and breathing, and are prohibited from calling 911 for medical emergencies without supervisory permission; and (7) healthcare and administrative personnel fail to refuse to arrange for detainees to be treated in outside facilities, even when an outside referral is necessary or proper.

134.   These widespread policies and practices were allowed to flourish because Defendant LaSalle, which directs the provision of healthcare services within its jails, has directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant LaSalle violated Mr. Anderson's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

135.   The above-described practices, so well-settled as to constitute de facto policy within LaSalle jails, were able to exist and thrive because Defendant LaSalle was deliberately indifferent to the problem, thereby effectively ratifying it.

136.   Defendants John Stuckey and Pamela Hearn were aware of these policies and practices as well, as they were implemented and carried out at Olla LCC, but failed to take reasonable steps to stop them, effectively adopting a policy of indifference and tacit approval of said policies and practices.

137.   The unconstitutional acts that ultimately resulted in Mr. Anderson's death were done in accordance with the official policies and widespread practices of the corporate and municipal defendants.

138.   These policies and practices were the moving force behind the unconstitutional actions of the individual defendants and caused Mr. Anderson's death. These policies and practices are more fully explained herein.

139.   The following are examples of such policies in practice:

a.      Holly Barlow-Austin went blind after LaSalle employees at Bi-State Jail failed to give her necessary medication, which resulted in a $7,000,000 settlement with LaSalle. Her injuries were the subject of a highly publicized lawsuit.

b.      A prisoner's lawsuit alleging that he fell at Jackson Parish Correctional Center and did not receive appropriate medical care resulted in a public $405,000 settlement with LaSalle.

c.      Cecil Williams suffered an asthma attack at a LaSalle facility and was denied treatment and resuscitation efforts for over an hour after losing consciousness.

d.      In September 2013, Greg McElvy, an inmate at a LaSalle facility, began exhibiting symptoms that indicated life-threatening illness, including vomiting, not eating, not drinking, self-defecating, self-urinating, respiratory distress, and abnormal blood pressure. Over the course of three days, he, other inmates, and one guard reported to LaSalle medical staff that he was dying and implored that he receive immediate medical attention. He was not taken to a hospital or medical doctor, and was ultimately found unresponsive in a pool of vomit and died of acute bronchopneumonia and asthmatic complications.

e.      In May 2015, Ronald Beesley died in the same LaSalle facility as Mr. McElvy after reporting chest pain and swelling in his limbs to LaSalle staff. His wife visited him the day before his death and, after observing that he

could barely walk or talk, contacted a LaSalle official to express that he was severely ill and needed medical attention. Mr. Beesley had a chest infection that could have been diagnosed and treated with antibiotics by a medical doctor, but Mr. Beesley was never taken to the hospital, was not monitored by LaSalle staff, was not medically treated by LaSalle staff, and consequently died in the LaSalle facility.

f.    In July 2015, Michael Sabbie died after LaSalle staff failed to provide medication and treatment for his heart disease and diabetes. LaSalle staff knew that Mr. Sabbie had many chronic and serious medical conditions and placed him in a medical observation cell, yet they did not give him medication, monitor him, or refer him to the appropriate medical providers. Throughout his time at the LaSalle facility, staff falsified his medical and observation records, practiced outside the scope of their licenses, and accused him of faking his condition. The staff responsible for his safety and medical care did not receive proper training. His death was the subject of a well-publicized lawsuit and a 169-page report and recommendation, written by United States Magistrate Judge Caroline M. Craven, denying LaSalle's summary judgment motion and detailing the widespread unconstitutional deficiencies at one of LaSalle's Texas jails. *See Sabbie v. Southwestern Corr., LLC*, No. 5:17cv113-RWS-CMC, ECF 122, 2019 U.S. Dist. LEXIS 214463 (E.D. Tex., Mar. 6, 2019).  LaSalle conducted no internal review of Mr. Sabbie's

death, made no policy changes, and took no other steps to correct the unconstitutional conditions, actions, and practices that led to his death.

g.      Because of LaSalle's failure to address these known issues, history repeated itself almost exactly a year later in July 2016 when Morgan Angerbauer died at only 20 years old in a LaSalle facility in Texas due to almost the exact same conditions that caused Mr. Sabbie's death. Ms. Angerbauer had chronic medical needs and was assigned to a medial observation cell, but she was not given her medication and not appropriately monitored. She was accused of faking her conditions and, even as she banged on her cell door for hours, was never referred to a hospital or medical doctor for an evidently life-threatening medical condition. As with Mr. Sabbie, the LaSalle facility was not appropriately staffed to address Ms. Aungerbauer's medical needs, and the staff that was there were not trained and/or acted consistently with the widespread unconstitutional practices within LaSalle's culture.

h.      In April 2018, LaSalle staff again failed to render adequate medical care to its detainees when one suffered a stroke and was not provided emergency services or taken to the hospital for approximately 24 hours.

i.      In July 2018, William Jones, a detainee at a LaSalle facility, was not provided medication, monitored, provided emergency medical services, or taken to the hospital after being beaten and injured. LaSalle never transported him to the hospital. Instead, they released him to his sister who called an

ambulance. By the time he got to the hospital, Mr. Jones was nearly dead and placed on a ventilator. He was hospitalized for nearly a month. His experience and injuries were the subject of a well-publicized lawsuit.

j.      In March 2019, Franklin Greathouse, a detainee in a LaSalle facility, reported having a seizure to LaSalle staff, who accused him of faking it and refused to refer him to a medical doctor or hospital. He died later the same day from a seizure. Even after state investigators and authorities found they were not in compliance with Texas jail standards, had failed to appropriately monitor Mr. Greathouse, and falsified observation logs, LaSalle made no changes to their conditions, policies, or practices.

k.      A diabetic woman died after a LaSalle nurse failed to give her medical treatment. Her death resulted in a public $200,000 settlement and the LaSalle nurse pleading guilty to negligent homicide.

l.      The U.S. Senate's Permanent Subcommittee on Investigations investigated a LaSalle facility in Irwin County, Georgia found that numerous female detainees housed there were subject to "excessive, invasive, and often unnecessary gynecological procedures," including hysterectomies. After Dawn Wooten, a nurse and former employee of LaSalle, reported unnecessary hysterectomies, LaSalle terminated her employment. She filed a whistleblower lawsuit. The investigation into the Irwin County facility revealed 659 reports from detainees who described "delayed or deficient medical care" and found that LaSalle failed to take appropriate corrective action in response to these

26

deficiencies. The Irwin County facility's conditions were so far below minimum standards that Immigration and Customs Enforcement (ICE) was ordered to stop housing detainees there.

### G.    LaSalle's provision of inadequate medical care is driven by the greed of its owners.

140.    LaSalle continues to implement the foregoing unconstitutional conditions, policies, and practices at their jails, despite their knowledge of the safety risk posed to inmates, primarily or entirely because it is profitable to do so.

141.    LaSalle routinely submits low bids to win contracts with municipalities for local jails.

142.    In order to profit from these below-market contracts, LaSalle aggressively cuts costs by hiring untrained, unlicensed correctional officers and low-level nurses, hiring fewer personnel than necessary to properly manage the jails, refusing to invest in training for their personnel, and discouraging employees from transporting inmates to clinics or hospitals, even when there is a life-threatening medical concern.

143.    Defendant Clay McConnell and Defendant William McConnell are aware of the foregoing policies and practices pursuant to which LaSalle provides inadequate medical care to detainees.

144.    Defendant Clay McConnell and Defendant William McConnell own and exercise ultimate control LaSalle's policies and practices.

145.  As such, Clay McConnell and Defendant William McConnell have a duty to ensure that LaSalle provides constitutionally adequate medical care to the people it detains.

146.  Defendants Clay and William McConnell knew about or were on notice of the foregoing policies and practices.

147.  Despite this knowledge, Defendants Clay and William McConnell turned a blind eye to, were indifferent, and tacitly encouraged these policies and practices to flourish within LaSalle facilities because doing so allows LaSalle to obtain more business and realize more profits, which enriches both men.

**H.    Harris County breached its non-delegable duty to provide people in its custody with adequate medical care.**

148.  Although Defendants Harris County and Sheriff Ed Gonzalez sought to privatize the operation of their jail by delegating final policy-making authority to LaSalle, Harris County and Sheriff Gonzalez cannot contract away their constitutional obligations, and they are liable for any unconstitutional corporate customs or policies that resulted in harm to any of their detainees and prisoners confined in the LaSalle jails, including the Olla LCC.

149.  In addition, Harris County and Sheriff Gonzalez were on notice that LaSalle had a policy of providing inadequate medical care, as described in this complaint.

150.  Despite this notice, Harris County contracted with LaSalle to house Harris County detainees.

151.    Indeed since 2015, LaSalle jails that are in Texas have been subject to multiple findings of noncompliance by the Texas Commission on Jail Standards.

152.    By outsourcing the incarceration of people like Mr. Anderson to private jails out of state, Harris County is able to evade oversight by the Texas Commission on Jail Standards.

153.    Harris County adopted and ratified the unconstitutional and negligent policies, practices, and conditions implemented by LaSalle at LaSalle Correctional Center.

154.    It was foreseeable that LaSalle's unconstitutional policies, practices, and conditions would jeopardize the safety of Harris County detainees housed at LaSalle jails.

155.    Harris County continues to pay LaSalle substantial sums to house the County's detainees.

156.    Harris County also partners with CoreCivic, with similar contracts to those with LaSalle.

157.    Like LaSalle, CoreCivic has been subject to numerous complaints of regarding inmate death and treatment at their jails.

158.    Harris County outsources the incarceration of people like Mr. Anderson to private jail facilities in part to save money and avoid oversight.

## CAUSES OF ACTION

I.    **All Plaintiffs v. Harris County, LaSalle Correctional Center L.L.C., LaSalle Corrections, L.L.C., LaSalle Management Company, L.L.C., and all individual defendants in their official capacities.**

159.    Plaintiffs incorporate all previous paragraphs as if fully restated here.

160.    An official policy or custom existed pursuant to which LaSalle Correctional Center L.L.C., LaSalle Corrections, L.L.C., LaSalle Management Company, L.L.C., Harris County, and the individual defendants in their official capacities (the "*Monell* Defendants") provided inadequate medical care to detainees in the custody of Harris County that are housed in LaSalle facilities, including the Olla LCC.

161.    Policymakers for the *Monell* Defendants knew about or were on notice of these policies and customs.

162.    These policymakers were deliberately indifferent to said policies and customs.

163.    These policies and customs were undertaken in wanton disregard for the rights and safety of others, including Mr. Anderson.

164.    These policies and customs were the driving force behind the failure to provide adequate medical care to Mr. Anderson, leading to his suffering and death, and caused a violation of Plaintiffs' rights.

165.    The *Monell* Defendants are liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983, and state law.

## II.    All Plaintiffs v. Ed Gonzalez Clay McConnell, William McConnell, John Stuckey, and Pamela Hearn in their individual capacities.

166.    Plaintiffs incorporate all previous paragraphs as if fully restated here.

167.    Defendants Ed Gonzalez Clay McConnell, William McConnell, and John Stuckey, and Pamela Hearn, in their individual capacities (the "Supervisor

Defendants"), are supervisors of one or more persons who violated Mr. Anderson's rights.

168.    The Supervisor Defendants adopted policies that encouraged or were indifferent to the provision of inadequate medical care within LaSalle facilities, including the Olla LCC.

169.    The Supervisor Defendants' foregoing policies caused Mr. Anderson's suffering and death, and the violation of Plaintiffs' rights under federal law and Louisiana law.

170.    The Supervisor Defendants adopted and/or failed to adopt the foregoing policies with deliberate indifference.

171.    Said policies and customs were undertaken in wanton disregard for the rights and safety of others, including Mr. Anderson.

172.    Said policies and customs were the driving force behind the failure to provide adequate medical care to Mr. Anderson, leading to his suffering and death, and caused a violation of Plaintiffs' rights.

173.    The Supervisor Defendants are liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983, and state law.

## III.    Plaintiffs v. Denise Finlay, Charlotte Fussell, Shannon Brewer, Assistant Warden Paul Smith, Mariah Dickey, and Lieutenant Morehead in their individual capacities.

174.    Plaintiffs incorporate all previous paragraphs as if fully restated here.

175.    Mr. Anderson was exposed to a substantial risk of serious harm.

176.   The following defendants, in their individual capacities, were deliberately indifferent to that risk:  Denise Finlay, Charlotte Fussell, Shannon Brewer, Mariah Dickey, Assistant Warden Paul Smith, and Lieutenant Morehead.

177.   The deliberate indifference of these defendants harmed Mr. Anderson, causing his suffering and death.

178.   Said indifference was undertaken in wanton disregard for Mr. Anderson's rights.

179.   Said indifference harmed Mr. Anderson, leading to his suffering and death, and caused a violation of Plaintiffs' rights.

180.   These defendants are liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983, and state law.

## IV.   All defendants—wrongful death.

181.   Plaintiffs incorporate all previous paragraphs as if fully restated here.

182.   Mr. Anderson died by the fault of the defendants.

183.   Plaintiffs, Mr. Anderson's widow and his children, bring this suit to recover damages which they sustained as a result of Mr. Anderson's death.

184.   As a result of Mr. Anderson's death, his widow and his children have lost his love, affection, companionship, services, and support.

185.   As a result of Mr. Anderson's death, his widow and children have also experienced pain, suffering, and distress resulting from his death.

186.   Plaintiffs further seek medical and funeral expenses for Mr. Anderson.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, actual damages, punitive damages, costs, attorneys' fees, disbursement, and any other and further relief as this Court deems just and equitable.

[SIGNATURES ON FOLLOWING PAGE]

Date: April 2, 2025                          Respectfully submitted,

*/s/ Aaron N. Maples*                        */s/ Stephen H. Weil*

Aaron Maples                                 Stephen Weil
Brendan Connick                              One of Plaintiff's Attorneys
Maples & Connick
733 Dante Street, Suite H                    Romanucci and Blandin, LLC
New Orleans, LA 70118                        Antonio Romanucci*
Tel: 504-269-3870                            Stephen Weil*
aaron@maplesconnick.com                      Sam Harton*
brendan@maplesconnick.com                    321 N. Clark St.
                                             Chicago, IL 60654
                                             Tel: (312) 458-1000
                                             Fax: (312) 458-1004
                                             aromanucci@rblaw.net
                                             sweil@rblaw.net
                                             sharton@rblaw.net

                                             *Attorneys for Plaintiffs*

                                             *Admitted in Illinois; application
                                             for admission pro hac vice
                                             forthcoming*