## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Nefertiti Gilbert *et al.*, | |
| Plaintiffs, | Case No:    1:25-CV-00421-DDD-JPM |
| v. | Judge:    Dee D. Drell |
| Harris County, Texas *et al.*, | Magistrate Judge:   Joseph H.L. Perex-Montes |
| Defendants. | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT GONZALEZ AND HARRIS COUNTY'S MOTION TO DISMISS

# TABLE OF CONTENTS

I.    Introduction ........................................................................................... 1

II.   Summary of Pleaded Facts ...................................................................... 4

III.  Legal standard ....................................................................................... 7

IV.   Discussion ............................................................................................. 8

    A.  Plaintiff has sufficiently pleaded municipal liability against Harris
        County. ............................................................................................ 8

        1.  Official Policy or Custom ...................................................... 9

        2.  Promulgation by Municipal Policymaker ........................... 14

        3.  Moving Force ...................................................................... 14

    B.  Plaintiff has sufficiently pleaded a constitutional violation by Defendant
        Gonzalez under a supervisory liability theory. ......................................... 15

    C.  Defendant Gonzalez is not entitled to qualified immunity....................... 18

        1.  Administrators like Sheriff Gonzalez should not be afforded qualified
            immunity............................................................................... 19

        2.  Cases holding municipalities liable for similar widespread practices
            notified Sheriff Gonzalez that his enacted policies were
            unconstitutional.................................................................... 20

        3.  Sheriff Gonzalez violated Harris County detainees' clearly
            established right to be provided care for serious medical needs. ...... 21

        4.  Sheriff Gonzalez continued to hire LaSalle despite its known and
            obvious consequences. ......................................................... 22

        5.  Sheriff Gonzalez's conduct was so plainly unconstitutional that any
            reasonable person would recognize it as unconstitutional. ............... 23

    D.  Punitive Damages Are Proper Because Defendant's Conduct Reflects
        Callous Indifference..................................................................... 24

## TABLE OF AUTHORITIES

### *Cases*

*Alvarado v. Westchester Cnty.*, 22 F. Supp. 3d 208 (S.D.N.Y. 2014).............................. 3

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................................ 8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................. 7

*Bustos v. Martini Club Inc.*, 599 F.3d 458 (5th Cir. 2010)).................................... 7

*Cunningham v. Castloo*, 983 F.3d 185 (5th Cir. 2020))......................................... 18

*Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006) ................................................... 21

*Ford v. Anderson Cnty., Texas*, 102 F.4th 292 (5th Cir. 2024).............................. 16

*Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141 (5th Cir. 2009) ................ 8

*Heidi Grp., Inc. v. Texas Health & Hum. Servs. Comm'n,* 138 F.4th 920
(5th Cir. 2025)............................................................................................... 20

*Highland Capital Mgmt., L.P. v. Bank of Am., Nat'l Ass'n*, 698 F.3d 202
(5th Cir. 2012) ............................................................................................... 7

*Hope v. Pelzer*, 536 U.S. 730 (2002).......................................................... 18, 23

*Hughes v. Garcia*, 100 F.4th 611 (5th Cir. 2024).............................................. 19-20

*Johnson v. Harris Cnty.*, 83 F.4th 941 (5th Cir. 2023).......................................... 9

*Jordan v. Gautreaux,* 2023 WL 1484929 (M.D. La. Feb. 2, 2023) ........................... 10

*Kent v. Collin Cnty., Texas*, 2022 WL 949963 (E.D. Tex. Mar. 29, 2022)...... 10, 13, 21

*King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012) .................................................. 11

*Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) ................................... 2-3, 10

*Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011)................................................. 7

*Parker v. Blackwell*, 23 F.4th 517 (5th Cir. 2022)........................................ 18, 22-23

*Payne v. Kerns*, 467 P.3d 659 (Okla. 2020) ....................................................... 16

*Peña v. City of Rio Grande City*, 879 F.3d 613 (5th Cir. 2018) ........................... 9, 16

*Putman v. Cnty. of Tuscola*, 2024 WL 3649809 (E.D. Mich. Aug. 5, 2024) .............. 10

*Reed v. Sw. Corr. Med. Grp., PLLC*, 2023 WL 11829982
(N.D. Tex. Mar. 31, 2023)..................................................... 11-12, 14-15, 21

*Reitz v. Woods*, 85 F.4th 780 (5th Cir. 2023) ................................................... 19

*Rodriguez v. S. Health Partners, Inc.*, 2020 WL 2928486
(N.D. Tex. June 3, 2020)................................................................................. 3

*Southard v. Tex. Bd. of Crim. Just.*, 114 F.3d 539 (5th Cir. 1997)........................... 20

*Lone Star Fund V (US), LP v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010) ..... 8

*Steel v. Alameda Cnty. Sheriff's Off.*, 428 F. Supp. 3d 235 (N.D. Cal. 2019) ........ 3, 10

*Taylor v. Riojas*, 141 S. Ct. 52 (2020)....................................................... 18, 23

*Valle v. City of Houston*, 613 F.3d 536 (5th Cir. 2010).......................................... 14

*Villarreal v. City of Laredo*, Texas, 44 F.4th 363 (5th Cir. 2022) ........................... 19

*Villarreal v. City of Laredo, Texas*, 134 F.4th 273 (5th Cir. 2025) ........................... 19

*West v. Atkins*, 487 U.S. 42 (1988) ............................................................. 9, 20

### *Statutes*

Federal Rule of Civil Procedure 12(b)(6) ....................................................... 2, 7

Plaintiffs, through their undersigned counsel, submit this response in opposition to the Rule 12(b)(6) motions to dismiss filed by defendants Harris County, Texas (ECF 28) (memo in support at ECF 28-1) and Harris County Sheriff Ed Gonzalez (ECF 27) (memo in support at ECF 27-1). For the reasons set forth below both motions should be denied.

## I.    Introduction

At the time of his death, Jaleen Anderson was a pretrial detainee who was being held in a private jail in Olla, Louisiana. The jail is operated by the LaSalle defendants.[1]  Around April 3, 2024, Mr. Anderson began experiencing a succession of increasingly severe seizures.  Medical staff at the facility, however, refused to summon an ambulance for him; at one point a nurse explained, "We don't send people to the hospital for seizures."  Eventually a guard overrode medical staff and called 911, but it was too late.  By 8:59 p.m. on April 3, he was dead.

Mr. Anderson was a resident of Houston, Texas.  He was at the Olla jail because Harris County had contracted with the LaSalle defendants to house some of the County's jail detainees.  The LaSalle defendants, however, were notorious for providing poor medical care to people in their custody.  Plaintiffs' complaint identifies multiple events, lawsuits, and even legislative findings all reflecting that the LaSalle defendants routinely failed to provide adequate medical care to LaSalle detainees, often with catastrophic results.  The complaint alleges that the practice

---

[1]  The LaSalle defendants are identified in the Complaint, ECF 1 ¶¶ 13-19.  They comprise multiple corporate entities and owners.  Plaintiffs refer to them collectively here as the LaSalle defendants.

of providing inadequate medical care was a widespread and well-settled custom among the LaSalle defendants, and was something the LaSalle defendants did in part to keep costs down so as to obtain business from municipal customers like Harris County.

Plaintiffs have sued the LaSalle defendants.  They have also sued Harris County and Harris County's Sheriff, defendant Ed Gonzalez.  Plaintiffs charge Harris County and Sheriff Gonzalez contracted with LaSalle and allowed Harris County detainees to be shipped off to LaSalle facilities even though the County and Gonzalez knew or were on notice that LaSalle had a lengthy record of providing inadequate medical care to its detainees, thus exhibiting deliberate indifference to the risk that the people they entrusted to LaSalle's care would be provided with inadequate medical care for serious medical conditions.  Plaintiffs also charge that by contracting with LaSalle to house and provide medical care to Harris County detainees, Harris County and Gonzalez effectively adopted the LaSalle defendants' policies and practices of providing inadequate medical care as their own.

Harris County and Sheriff Gonzalez have both moved to dismiss the claims against them pursuant to Rule 12(b)(6).  Both defendants' arguments are somewhat hard to understand, because they remain undeveloped.  From what Plaintiffs have been able to parse, however, neither withstands scrutiny.  Plaintiffs briefly summarize them here.

**Harris County** argues, invoking *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978), that Plaintiff's claims against it must fail because they do not allege

2

that the County made a "written policy statement, regulation, or decision," or that the County has an unlawful "widespread practice" either.  ECF 28-1 at 10.  Under *Monell*, however, it is well settled that a municipality's entry into a contract is an official act by the municipality—particularly a contract for the care of a county's jail detainees, like the contract here. *See, e.g.*, *Rodriguez v. S. Health Partners, Inc.*, No. 3:20-CV-0045, 2020 WL 2928486, at *6 & n.8 (N.D. Tex. June 3, 2020) (noting that for purposes of *Monell*, county's entering into a contract for jail medical care was an official act); *Steel v. Alameda Cnty. Sheriff's Off.*, 428 F. Supp. 3d 235, 242 (N.D. Cal. 2019) (same).  And courts have held that a county may be liable for entering into jail medical contracts when they are on notice that the vendor has a history of providing inadequate medical care.  *See, e.g.*, *Alvarado v. Westchester Cnty.*, 22 F. Supp. 3d 208, 218 (S.D.N.Y. 2014) (*Monell* liability where county signed contract with private medical provider despite awareness of provider's record of providing inadequate medical care).  Plaintiffs allege precisely this, and thus have adequately alleged claims against Harris County and its policymaker, Sheriff Gonzalez.

**Sheriff Gonzalez** argues separately that he is entitled to qualified immunity.  The Court of Appeals recently expressed hostility to invocations of qualified immunity by administrators like Sheriff Gonzalez, who make unconstitutional decisions in the comfort of an office, and Sheriff Gonzalez's invocation of qualified immunity is thus dubious at the threshold.  But even if qualified immunity were to apply here, it is amply well-established that a jailor may not adopt policies that deprive detainees of adequate medical care for serious

3

medical needs—which is what Plaintiffs allege Sheriff Gonzalez did by entrusting detainees to a private contractor with a lengthy record of providing inadequate medical care. Qualified immunity does not apply. Plaintiffs have made adequate allegations against both Harris County and Sheriff Gonzalez and they should be permitted to gather evidence to support those claims and prove them to a jury. The motions to dismiss should be denied.

## II.    Summary of Pleaded Facts

At the time of his death, Jaleen Anderson was a 29-year-old resident of Houston, Texas. ECF 1 at ¶ 30. He was arrested in Harris County on a drug possession charge and brought to the Harris County jail in Houston. Harris County and its Sheriff, Ed Gonzalez, contract with private jail companies, including the LaSalle defendants, to outsource the confinement of people like Mr. Anderson who are in their custody. ECF 1 at ¶¶ 9-11. Consequently, shortly after his arrest, Harris County sent Mr. Anderson to LaSalle Correctional Center in Olla, Louisiana (Olla LCC) to await adjudication of his charges. *Id.* at ¶¶ 33-34.

In outsourcing the confinement of detainees, Harris County and Sheriff Gonzalez also outsource their duty to provide adequate medical care and human conditions of confinement to LaSalle. *Id.* at ¶ 12. The complaint alleges, however, that there exist policies and practices within facilities operated by the LaSalle defendants pursuant to which prisoners receive unconstitutionally inadequate healthcare. ECF 1 ¶ 133. Plaintiff has alleged specific widespread practices

pursuant to which LaSalle detainees receive unconstitutionally inadequate medical care:

> (1) healthcare personnel commonly fail to respond or follow up on complaints by detainees and prisoners about their health status;

> (2) detainees are left in "observation" cells where no care or assessment is provided;

> (3) healthcare personnel fail to follow appropriate diagnostic procedures, favoring instead cheaper procedures even if they are demonstrably ineffective;

> (4) healthcare personnel fail to take action to secure appropriate continuity of care for complicated and urgent conditions;

> (5) low-level nurses, including licensed vocational nurses and licensed practical nurses, are allowed to practice outside of their medical licenses and address life-threatening ailments that they are not licensed or qualified to assess or to treat;

> (6) guards are under-trained, and are not trained regarding their obligations with respect to medical care, and are instructed not to seek outside medical care so long as a detainee is alive and breathing, and are prohibited from calling 911 for medical emergencies without supervisory permission; and

> (7) healthcare and administrative personnel fail [or] refuse to arrange for detainees to be treated in outside facilities, even when an outside referral is necessary or proper.

*Id*. The complaint points to multiple instances where these practices resulted in the of delivery of inadequate by the LaSalle defendants, including eleven different, specific, well-publicized incidents in which people detained in LaSalle facilities received catastrophically inadequate care, *see* ECF 1 ¶¶ 139(a)-(k), findings by Congress that LaSalle engaged in medical abuse against numerous detainees in its

care, *id.* ℙ 139(*l*); and multiple findings of non-compliance by the Texas Commission on Jail Standards. *Id.* ℙ 151.

On the strength of these facts, the complaint goes on to allege that at the time of Mr. Anderson's death, the County and Gonzalez knew or was on notice that LaSalle had a policy of providing inadequate medical care to people in its custody, ECF 1 at ¶¶ 130, 149, yet they chose to contract with LaSalle anyway, with the result they entrusted to LaSalle's custody numerous detainees, including Mr. Anderson, despite LaSalle's track record. *Id.* ℙℙ 148-165.

The complaint alleges that given LaSalle's extensive, public history of critical incidents caused by inadequate medical care, it was foreseeable that people would continue to die and get seriously hurt under their deficient care. *Id.* at ¶¶ 139, 140, 154, 158. Yet, they chose to contract with LaSalle to house Harris County detainees, and in so doing adopt and ratify their policies and practices. *Id.* at ¶¶ 141, 150, 152, 158. 168.

The complaint alleges that the predictable consequence of the continued relationship between Harris County, Gonzalez, and LaSalle—and thus the shipping of Harris County detainees to LaSalle facilities outside the purview of oversight bodies—was another preventable death. While at Olla LCC, Mr. Anderson began to suffer from seizures. *Id.* at ¶ 36. Over the next twenty-four hours, Mr. Anderson continued to seize, vomit, self-urinate, lay on the ground, and show other signs of disorientation and serious illness. *Id.* at ¶¶ 36, 48, 63-64, 68-69, 72, 78-82, 84-86, 88-92, 97, 100, 111. Despite multiple LaSalle staff being notified of Mr. Anderson's

concerning condition, he was not given medical treatment or referred to a hospital. *Id.* at ¶¶ 37-47, 49-62, 65-67, 70-77, 100-110. When a lieutenant finally decided to call an ambulance, Mr. Anderson was unresponsive and without a pulse. *Id.* at ¶¶ 111, 115-118. He was pronounced dead shortly thereafter. *Id.* at ¶ 124.

### III. Legal standard

Harris County and Sheriff Gonzalez move to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss under Federal Rule of Civil Procedure 8, a complaint must contain "sufficient factual allegations to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 (2007). In reviewing the sufficiency of the allegations, a court "accept[s] all well-pleaded facts as true and view[s] those facts in the light most favorable to the plaintiff." *Highland Capital Mgmt., L.P. v. Bank of Am., Nat'l Ass'n*, 698 F.3d 202, 205 (5th Cir. 2012) (quoting *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010)). Courts are asked to draw all "reasonable inferences in favor of nonmoving party." *Morgan v. S wanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc).

The role of court "is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Lone Star Fund V (US), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). "A motion to dismiss

under rule 12(b)(6) is viewed with disfavor and is rarely granted." *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009) (quotation omitted).

## IV.    Discussion

Harris County's sole argument is that Plaintiffs have failed to state a claim supporting municipal liability for a constitutional violation. But Plaintiffs have sufficiently alleged that Harris County was deliberately indifferent to its detainees' medical needs via its contract with LaSalle and the policies and practices that were the moving force behind Mr. Anderson's death—and they have alleged an official municipal act, the entering into the contract with LaSalle, that proximately resulted in Mr. Anderson's death.

Sheriff Gonzalez makes two primary arguments, both of which fail. First, he argues that Plaintiffs have failed to state a claim against Gonzalez, but Plaintiffs explain herein that they have met each element required to sufficiently allege Sheriff Gonzalez's supervisory liability. Second, he argues that they are entitled to qualified immunity, but the violation Plaintiffs allege was clearly established at the time of Mr. Anderson's death. Both Defendants also argue that they should not be subject to punitive damages.

### A. Plaintiff has sufficiently pleaded municipal liability against Harris County.

Plaintiffs' complaint has made it plausible that the County is responsible for Mr. Anderson's death, not on a theory of *respondeat superior*, but because it implemented policies and practices that deprived detainees like Mr. Anderson of basic, life-saving medical care. There are three elements of municipal liability under

Section 1983: "A plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018). Plaintiffs allege that Harris County and Sheriff Gonzalez entered into a contract with LaSalle, a company they knew routinely deprived detainees of medical care, to manage the custody and care of County detainees. In so doing, Harris County subjected the people in their custody to the unconstitutional customs characteristic of LaSalle facilities, such as the refusal to refer people to outside medical providers during medical emergencies. Consequently, Jaleen Anderson suffered seizures and other concerning symptoms inside Olla LCC for a lengthy period without diagnosis or treatment. His death is directly attributable to LaSalle and, thus, Harris County.

### 1.  Official Policy or Custom

Plaintiff has alleged several policies and customs which subject Harris County to liability. "An official policy includes the decisions of a government's law-makers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Johnson v. Harris Cnty.*, 83 F.4th 941, 946 (5th Cir. 2023) (cleaned up). "Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody . . . ." *West v. Atkins*, 487 U.S. 42, 56 (1988). "A robust consensus of persuasive authority indicates that, while [a private contractor] provides the medical care for [a defendant] County's detainees, [the defendant] County remains liable for any constitutional deprivations caused by [the

contractor's] policies, practices, or customs." *Kent v. Collin Cnty., Texas*, No. 4:21-CV-412-SDJ, 2022 WL 949963, at *6 (E.D. Tex. Mar. 29, 2022) (collecting cases). In short, a municipality "cannot absolve itself of liability by using contracted medical care providers at its jail." *Id.* at *7 (E.D. Tex. Mar. 29, 2022); *See also Jordan v. Gautreaux,* No. CV 21-48-JWD-SDJ, 2023 WL 1484929, at *2 (M.D. La. Feb. 2, 2023) ("a parish can be liable for damages under federal law for failure to contract for and fund constitutionally adequate medical and mental health care.").

As an initial matter, the County chose to contract a private company to maintain care and custody of their inmates, even though they knew the contractor had a history of sacrificing necessary healthcare to cut costs. See ECF 1 at ¶¶ 133, 139-142, 148-150. Multiple courts have held that under *Monell*, such choices are official acts that may permissibly be attributed to a municipality like Harris County.  *See, e.g.*, *Putman v. Cnty. of Tuscola*, No. 1:23-CV-10427, 2024 WL 3649809, at *7 (E.D. Mich. Aug. 5, 2024) (holding that county's decision to enter into a contract with private medical contractor was an official act under *Monell* and that "[a]ccordingly, Plaintiff's Monell claim need not resort to alternative theories applicable to unwritten municipal policies and practices. Instead, Plaintiff's *Monell* claim may proceed under the official-policy framework, relying on the County and CHC's official written contract."); *Steel*, 428 F. Supp. at 242 (holding that sheriff's entering into a contract for jail medical care was an official act under *Monell*, since it was "a course of action consciously chosen among various alternatives," and that

as such the choice to enter into the contract "may fairly be said to represent official policy." (quotation omitted)).

When a "County is 'faced with actual or constructive knowledge that its agents will probably violate constitutional rights, [it] may not adopt a policy of inaction.'" *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012), quoting *Warren v District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004)). Yet in contracting to have Harris County detainees entrusted to the care of the LaSalle defendants despite their track record of inadequate care, Harris County and Sheriff Gonzalez did just that. That was the situation in *Reed v. Sw. Corr. Med. Grp., PLLC*, No. 7:21-CV-126, 2023 WL 11829982 (N.D. Tex. Mar. 31, 2023). In *Reed*, the court held that a plaintiff adequately pleaded an official policy against a Texas county where the alleged policy could be "evidenced by an inadequate and allegedly risky contractual agreement." 2023 WL 11829982, at *3-4. There, the county had agreed to a contract with private companies "to provide medical and mental health services for individuals incarcerated and detained in the [defendant] County Jail." *Id.* That contract was "inadequate and allegedly risky" in large part because the defendant county knew the private contractor's "history of being sued for constitutional violations related to medical care services provided to jails." *Id.*

By contracting with and delegating care of people in custody to LaSalle, Harris County adopted their unconstitutional policies and is liable for them as if they executed the policies themselves. Indeed, Plaintiffs' complaint cites numerous public examples of their systemic failures resulting in poor health outcomes—

11

including serious injuries and deaths—well before Harris County sent Mr.
Anderson to Olla LCC. ECF 1 ¶¶ 130,139.

These allegations support the plausible inference that Harris County and
Gonzalez were on notice of LaSalle's persistent pattern of constitutional violations
yet continued to send detainees to their facilities. Further, Plaintiffs specifically
alleged that LaSalle's inadequate health care was incentivized by the need to keep
costs low to support below-market bids that would win contracts with municipalities
like Harris County. ECF 1 ¶¶ 139-142, 148-150. Like in *Reed*, Harris County
entered into an inadequate and risky contract with a company known to cut corners
at the risk of harming and even killing detainees. *Id.*

Plaintiffs have also alleged specific widespread practices instituted by
LaSalle, and thus Harris County, which routinely deprived detainees of healthcare.
For example, Plaintiffs alleged that Harris County (via LaSalle) maintained a
custom in which "personnel fail [or] refuse to arrange for detainees to be treated in
outside facilities, even when an outside referral is necessary or proper," which was
one of many inadequate practices which supported the systemic deprivation of
healthcare and allowed LaSalle to offer below-market bids for government
contracts. ECF 1 at ¶¶ 133, 140-142. Indeed, it is plausible on the face of Plaintiffs'
Complaint that Harris County had an official policy of not referring detainees to the
hospital for his seizures, even though seizures, especially repeated ones like Mr.
Anderson suffered, are serious, life-threatening conditions. ECF 1 at ¶¶ 2, 51-38-42,
52, 94 (in response to Mr. Anderson's condition, a LaSalle nurse explicitly told

12

guards "we don't send people to the hospital for seizures."). This is analogous to *Kent*, where the plaintiff alleged that a municipality, through its contract with a medical provider, adopted a policy of "refusing to transfer inmates to offsite medical providers despite the obvious need to do so unless there was a dire emergency." 2022 WL 949963, at *7. Finding these allegations sufficiently specific to satisfy the policy element, the court noted that the plaintiff identified a "cost containment program" as part of their bid to earn a contract with the contract. *Id.* Harris County, knowing that LaSalle had been subject to numerous lawsuits and an investigation by a U.S. Senate subcommittee due to poor healthcare in their facilities, including the refusal to refer (ECF 1 at ¶ 139), took a cheap contract and allowed a company notorious for its poor care to take over custody of their detainees. As a result, LaSalle instituted widespread practices even more dangerous than that identified in *Kent*, as the policy of refusing to transfer inmates to offsite medical providers even applied to dire emergencies like repeated seizures. ECF 1 at ¶¶ 100, 133, 139.

Beyond these failures to refer detainees, Plaintiffs have also alleged that LaSalle maintained widespread customs in which personnel did not respond to medical complaints, failed to secure continuity of care for serious conditions, and provided care beyond their licensure. ECF 1 at ¶ 133. Additionally, detainees were routinely left in observation cells without medical care and guards were not trained regarding their obligations in terms of inmate medical care. *Id.* These deficient practices culminated in a near complete lack of access to basic medical care as a matter of policy in LaSalle facilities. Harris County knew this was how LaSalle

13

operated yet trusted its constitutional obligations to the private contractor at a cut rate, adopting their unconstitutional policies and widespread practices.

### 2. Promulgation by Municipal Policymaker

Under the second prong, "actual or constructive knowledge of a custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (internal brackets omitted). In a case such as this, a plaintiff need not "specifically state that the Sheriff was the person who approved or entered into the agreement with the contractor" so long as "such action by the County Sheriff is plausible, may be reasonably inferred from Plaintiff's complaint, and that evidence on this material point will likely be introduced at summary judgment or trial after discovery is conducted." *Reed*, 2023 WL 11829982, at *4.

Ultimately, the policies are evidently attributable to the County. Plaintiffs allege that the County outsourced its jail management duties to a company whose penchant for denying medical care to detainees was a matter of public record. The plausible allegation of such the cut-rate contract between the County and LaSalle sufficiently attributes the widespread denial of medical care to Harris County.

### 3. Moving Force

To prove the "moving force element, "the plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010). This can be sufficiently alleged by pleading that the County entered into a contract even though "[the] County was

aware of the [contractor's] history of failing to provide adequate medical care when contracted to provide such care to inmates and detainees at other jails." *Reed*, 2023 WL 11829982, at *4. As discussed, *supra,* that is precisely what happened in this case: the County delegated its duty to provide medical care to inmates to LaSalle, despite the County's knowledge that LaSalle routinely denied medical care to detainees.

Harris County's contract with LaSalle and, in turn, LaSalle's widespread practice of depriving detainees of medical care caused Mr. Anderson's death. For hours on end, jail staff witnessed Mr. Anderson suffer seizures, vomit, urinate himself, and show other signs of disorientation and serious illness. ECF 1 at ¶¶ 36, 48, 63-64, 68-69, 78-82, 84-90, 92, 97, 111. Consistent with their policies, they did not refer him to a hospital, attempt to diagnose him, or secure continuity of his care. *Id.* at ¶¶ 42-47, 53-62, 72-76, 94-96, 100, 102-110, 114. Staff at Olla LCC put Mr. Anderson in an observation cell where he was primarily supervised by guards without medical training when he needed to be assessed, diagnosed, and treated by a physician for his medical emergency. *Id.* at ¶¶ 58-62, 77, 96. Indeed, a medical provider, who notably did not carry a license to practice medicine, made the decision *not* to refer him because of a rule that at LaSalle, "We don't send people to the hospital for seizures." *Id.* at p. 2.

### B. Plaintiffs have sufficiently pleaded a constitutional violation by Defendant Gonzalez under a supervisory liability theory.

A supervisor may be liable for the violation of a pretrial detainee's constitutional rights if the supervisor acts—or fails to act—with deliberate

15

indifference to the rights of detainees. *Peña v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018). To sufficiently state a supervisory liability claim against a Sheriff, "a plaintiff must show either that the supervisor personally was involved in the constitutional violation or that there is a sufficient causal connection between the supervisor's conduct and the constitutional violation." *Ford v. Anderson Cnty., Texas*, 102 F.4th 292, 321 (5th Cir. 2024) (cleaned up). This can be done by alleging the supervisory official "implement[ed] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Id.*

Plaintiffs have alleged a sufficient causal connection between Defendant Gonzalez's implementation of policies, which were themselves a repudiation of constitutional rights, and Mr. Anderson's deprivation of medical care. Ed Gonzalez was the sheriff for Harris County and controlled whether detainees like Mr. Anderson were transferred to a LaSalle facility like Olla LCC. *See Payne v. Kerns*, 467 P.3d 659, 668 (Okla. 2020) ("We noted, the sheriff, as a supervisory authority, could be held liable under § 1983 if an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his or her exercise of control or direction, or his or her failure to supervise."). LaSalle's pattern of neglecting the medical needs of patients was well documented prior to Mr. Anderson coming to Harris County Jail. ECF 1 at ¶ 139.

Despite this widely available information, Sheriff Gonzalez actively facilitated the transfer of detainees like Mr. Anderson to be sent to the Olla LCC.

*Id.* at ¶¶ 32-34, 124, 160, 164. Gonzalez oversaw Harris County's outsourcing of pretrial detainees to a private facility—Olla LCC—which it knew was operated by a company who had a well-documented pattern of inadequate medical care. ECF 1 at ¶¶ 133, 139, 148-151. In so doing, Gonzalez knowingly maintained a policy of outsourcing detainees to inadequate LaSalle facilities, knowing the significant risk that detainees there would receive little to no medical care in the event of an emergency. That choice was not passive oversight; it was a deliberate policy maintained in the face of a plainly obvious risk of harm. LaSalle had "widespread policies and practices" that included failing to respond to medical complaints, avoiding appropriate diagnostic procedures, and routinely prioritizing cheaper treatments over necessary ones. ECF 1 at ¶¶ 133–134. Such conduct supports individual liability under Section 1983.

The Sheriff was aware of and maintained a harmful policy—contracting with LaSalle and sending detainees to their facilities, knowing they lacked adequate medical care. ECF 1 at ¶¶ 133, 139, 148-151; *Supra* at pp. 9-14. This policy directly led to Mr. Anderson's death, as he suffered an obvious medical emergency in a LaSalle facility without receiving any life-saving care or being sent to the hospital. ECF at ¶¶ 94, 102, 124, 154, 164, 172; *Supra* at pp. 14-15. The Sheriff's continued reliance on LaSalle, despite its known failures, amounts to deliberate indifference—not mere negligence—because it reflects a conscious disregard for the detainees who will need medical care while in a LaSalle facility.

17

**C. Defendant Gonzalez is not entitled to qualified immunity.**

Determining whether an official is entitled to qualified immunity involves two inquiries: (1) "whether the officer violated a constitutional right," and (2) "whether the 'right at issue was "clearly established" at the time of the alleged misconduct.'" *Id.* As discussed, Plaintiffs have sufficiently alleged Gonzalez violated Mr. Anderson's constitutional rights by subjecting him to policies and customs that put him at an unreasonable risk of being deprived of medical care. *Supra* at pp. 9-14.

Regarding the second inquiry, courts recognize two ways to satisfy this standard: (1) by identifying materially similar precedent that put officials on notice, or (2) by showing that the violation was so obvious that no case law was needed. *Hope v. Pelzer*, 536 U.S. 730 (2002); *Taylor v. Riojas*, 141 S. Ct. 52 (2020). When finding materially similar precedent, the plaintiff need not identify a case "squarely on point," but existing precedent must make the unlawfulness of the conduct "beyond debate." *Parker v. Blackwell*, 23 F.4th 517, 522 (5th Cir. 2022) (quoting *Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020)). At least three cases put Gonzalez on notice of his unlawful conduct, as they clearly established that he could not 1) implement policies and practices that deprive detainees of medical care, even if through a contractor, 2) deprive detainees of medical care, and 3) continuously rehire an entity like LaSalle with full comprehension of the negative consequences. And if those were not enough, Gonzalez's conduct was so obviously in conscious disregard of Mr. Anderson's safety that he should not be afforded qualified immunity.

18

### 1. __Administrators like Sheriff Gonzalez should not be afforded qualified immunity.__

Presuming that contracting with LaSalle in these circumstances resulted in a constitutional violation, Sheriff Gonzalez invokes the doctrine of qualified immunity. Electing to contract with LaSalle under these circumstances, however, was an administrative matter—not the type of split-second decision for which qualified immunity is intended. The Fifth Circuit has said as much repeatedly, noting that qualified immunity is simply unnecessary for administrators like Sheriff Gonzalez. *See Villarreal v. City of Laredo*, 44 F.4th 363, 371, *reh'g granted*, 52 F.4th 265 (5th Cir. 2022) (noting that "[t]here is a big difference between 'split-second decisions' by police officers and 'premeditated plans'" to carry out activities that are unconstitutional). Indeed the Court of Appeals has held that qualified immunity may be denied when the violation arises from a decision taken in an "unhurried setting" *Reitz v. Woods*, 85 F.4th 780, 793 (5th Cir. 2023). *Accord Hughes v. Garcia*, 100 F.4th 611, 620 n.1 (5th Cir. 2024) (explaining that the core areas of qualified immunity "involve excessive force, or split-second decisions, or the chaos of a chase"). Judge Oldham has noted:

> It is increasingly unclear whether the rationale for qualified immunity makes sense in a case like this one. I understand the need for qualified immunity when officers are forced to make split-second decisions, often with imperfect information and under potentially deadly or dangerous circumstances. But . . . [w]hen an officer has the time to make such plans, to consult counsel, and to investigate all the facts, it is unclear whether and to what extent qualified immunity should apply.

*Villarreal v. City of Laredo, Texas,* 134 F.4th 273, 277 (5th Cir. 2025) (Oldham, J., concurring); *Accord Heidi Grp., Inc. v. Texas Health & Hum. Servs. Comm'n,* 138

F.4th 920, 933 (5th Cir. 2025) (denying qualified immunity in part because "Dacus's eleven-month-long secret investigation into Heidi does not resemble the areas in which qualified immunity is most justifiable," and citing *Hughes* to contrast situations involving officers making "split-second decisions").

Sheriff Gonzalez's decisions with respect to LaSalle were the decisions of an administrator—inarguably the unhurried setting in which the Court of Appeals has explained that the rationale underlying qualified immunity makes little sense. That fact makes the Sheriff's invocation of qualified immunity dubious at the threshold. Minimally, it calls for a different analysis than the strict application of the doctrine that is afforded to situations in which the government defendant was forced to make split-second decisions. There is ample case law putting an official like the Sheriff on notice that entrusting his detainees to the LaSalle defendants was unlawful, as set out *infra*. Qualified immunity should be denied.

## 2. Cases holding municipalities liable for similar widespread practices notified Sheriff Gonzalez that his enacted policies were unconstitutional.

Sheriff Gonzalez was put on notice that his conduct was unconstitutional by the cases imposing liability on municipalities for the same dangerous policies. After all, there is a "close relationship between the elements of municipal liability and an individual supervisor's liability." *Southard v. Tex. Bd. of Crim. Just.*, 114 F.3d 539, 551 (5th Cir. 1997). Like the municipality for which he is the final policymaker, Gonzalez "bore an affirmative obligation to provide adequate medical care to [detainees]." *West v. Atkins*, 487 U.S. 42, 56 (1988). *West* clearly established that "[c]ontracting out prison medical care does not relieve [a government entity] of its

constitutional duty to provide adequate medical treatment to those in its custody."
*Id.* This principle has been repeatedly enforced against municipalities, including
fellow Texas counties, in the apposite scenario of hiring a private contractor to
manage jail operations like the provision of inmate healthcare. See e.g., *Reed*, 2023
WL 11829982 (finding a plaintiff sufficiently pleaded a constitutional violation
where they alleged a "risky contractual agreement" between a Texas county and a
contractor that resulted in the deprivation of medical care); *Kent v. Collin Cnty.,
Texas*, No. 4:21-CV-412-SDJ, 2022 WL 949963, at *6 (E.D. Tex. Mar. 29, 2022)
(collecting cases). Sheriff Gonzalez repudiated his responsibility to guarantee
healthcare to detainees in Harris County custody by entering into a contract with
LaSalle and adopting its policies. The law has placed it beyond debate that
government officials cannot enact such policies which deprive detainees of basic
medical care.

### 3. Sheriff Gonzalez violated Harris County detainees' clearly established right to be provided care for serious medical needs.

It has long been clearly established that prisoners have a right to be provided
adequate medical care for serious medical needs. *Easter v. Powell*, 467 F.3d 459, 465
(5th Cir. 2006). It is "clearly established that a prison inmate could demonstrate an
Eighth Amendment violation by showing that a prison official refused to treat him,
ignored his complaints, intentionally treated him incorrectly, or engaged in any
similar conduct that would clearly evince a wanton disregard for any serious
medical needs." *Id.* (cleaned up). That is exactly what happened to Mr. Anderson,
here. He exhibited deeply concerning symptoms for over a day, to which LaSalle

staff responded by laughing, refusing to send him to the hospital, and accusing him of faking. ECF 1 at ¶¶ 36, 48, 63-64, 68-69, 73, 78-82, 84-90, 92, 97, 111, 114. This conduct is consistent with the conduct LaSalle had previously been sued and investigated for, which included not only the analogous scenarios of people dying in LaSalle custody because they were not referred to a hospital during a medical emergency, but also nightmarish stories of detainees being subject to forced, nonconsensual sterilization procedures. Id. at ¶ 139. Surely, Sheriff Gonzalez was on notice that the law did not allow him to send detainees to a facility where he knew such wanton deprivation of medical care would occur, and Plaintiffs' Complaint makes it plausible that he comprehended the danger he was risking by sending detainees to a LaSalle facility. Id. at ¶ 139-142, 148-150. Plaintiffs allege that Sheriff Gonzalez knew what dangerous practices occurred inside the walls of LaSalle jails, and he is just as culpable in the perpetuation of those practices by providing LaSalle with more people to harm.

### 4. **Sheriff Gonzalez continued to hire LaSalle despite its known and obvious consequences.**

In *Parker*, the Fifth Circuit held that a sheriff's rehiring of a jailer previously terminated for abusing detainees plausibly alleged a violation of clearly established constitutional rights, defeating qualified immunity. 23 F.4th at 524. The court emphasized that the connection between the jailer's prior misconduct and his rehiring in the same environment where the abuse had occurred created a "strong connection" under previous Fifth Circuit precedent, such that a reasonable

supervisor would have understood the "plainly obvious consequences" of the hiring decision. *Id.* at 523.

Similarly to *Parker*, in this case, Sheriff Gonzalez hired LaSalle to manage the custody and care of Harris County detainees. And as in *Parker*, Gonzalez's decision was not based on speculative risks, but rather on a known pattern of prior constitutional violations that mirrored the harm suffered by the detainees here: preventable deaths due to inadequate care. The clearly established principle that a supervisor may not ignore a strong connection between a contractor's history and the specific harm alleged applies with equal force to this case. Just as rehiring a known abuser into the same jail supported a finding of deliberate indifference, so too does continuing to contract with a known harmful medical provider. Accordingly, under *Parker* the Sheriff's conduct violated clearly established law, and qualified immunity should be denied.

### 5. Sheriff Gonzalez's conduct was so plainly unconstitutional that any reasonable person would recognize it as unconstitutional.

Finally, qualified immunity does not protect officials whose conduct is so egregious that any reasonable person would recognize it as unconstitutional. *See, e.g.*, *Taylor*, 592 U.S. at 8-9 (per curiam); *Hope*, 536 U.S. at 741. As the Supreme Court explained in *Hope*, "[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." 536 U.S. 730, 741 (2002). The "salient question" is not whether there is a case with identical facts, but whether "the state of the law. . . gave [the officials] fair warning" that their conduct was

23

unconstitutional. *Id.* Overreliance on factual similarity risks allowing obvious violations to escape accountability. *Id.*

Gonzalez disregarded repeated complaints, lawsuits, and other public evidence documenting LaSalle's ongoing failure to provide adequate medical care, *see* ECF 1 at ¶¶ 132-139, 148-150. Given this well-established record, any reasonable official would have understood that continuing to contract with LaSalle and moving detainees like Mr. Anderson to Olla LCC posed a serious risk of constitutional harm. Qualified immunity does not shield officials who act despite clear and obvious warnings of unconstitutional conduct. Gonzalez's decision to continue contracting with LaSalle, despite its well-documented history of constitutional violations, was so clearly fraught with risk that any reasonable official would have recognized the consequences. Even if the Court views this as a novel factual scenario, the Complaint renders it plausible that Gonzalez's actions were so obviously unconstitutional that they defeat qualified immunity.

### D. Punitive Damages Are Proper Because Defendant's Conduct Reflects Callous Indifference

Defendants argue that Plaintiffs failed to allege Defendants' conduct was motivated by evil motive or intent, and therefore contend that punitive damages should be dismissed. ECF 27 at ¶ 33. Plaintiffs agree that a municipality cannot be held liable for punitive damages, but Gonzalez's decision-making in this case carries sufficient culpability for a jury to award punitive damages. Punitive damages are not limited to conduct motivated by evil intent. As the Supreme Court clarified in *Smith v. Wade*, punitive damages may also be awarded when a defendant acts with

24

"reckless or callous indifference" to federally protected rights—conduct that falls short of intentional wrongdoing but reflects a conscious disregard of serious risk. 461 U.S. 30, 51 (1983). Plaintiffs have plausibly alleged such callous indifference here, as Defendant Gonzalez knowingly contracted with a medical provider with a documented history of poor care resulting in preventable deaths. Plaintiffs' complaint plausibly alleges that Sheriff Gonzalez's indifference as a supervisor warrants punitive damages in this case. *See* ECF 1 at ¶¶ 168-173. Thus, Plaintiffs have sufficiently pleaded facts supporting punitive damages.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny dismissal of Defendant Gonzalez's individual-capacity claims, even if the official-capacity claims are dismissed. Moreover, Plaintiffs have sufficiently alleged facts supporting punitive damages, which should be allowed to proceed to the jury for determination.

Respectfully Submitted,

<u>/s/ Sam Harton</u>

Antonio Romanucci (*pro hac vice*)
Stephen Weil (*pro hac vice*)
Sam Harton (*pro hac vice*)
**Romanucci and Blandin, LLC**
321 N. Clark St.
Chicago, IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
aromanucci@rblaw.net
sweil@rblaw.net
sharton@rblaw.net

25

/s/ Aaron N. Maples
Aaron Maples
Brendan Connick
**Maples & Connick**
733 Dante Street, Suite H
New Orleans, LA 70118
Tel: 504-269-3870
aaron@maplesconnick.com
brendan@maplesconnick.com

26