# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| Nefertiti Gilbert, et al., | ) | |
| | ) | |
| Plaintiff, | ) | Case No:      1:25-CV-00421-DDD-JPM |
| | ) | |
| vs. | ) | Judge:        Dee D. Drell |
| | ) | |
| Harris County, Texas, et al., | ) | Magistrate:   Joseph H. L. Perez-Montes |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO MOTIONS FOR JUDGMENT ON THE PLEADINGS FILED BY THE LASALLE DEFENDANTS (ECF 73, 74, 75)**

**Table of Contents**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND................................................................................................... 2

   A.   Jaleen Anderson's death at a LaSalle facility. ............................................................ 2

   B.   The LaSalle / *Monell* defendants' practice of providing inadequate medical care to people in their care, and the indifference of supervisors to that practice. ................. 5

   C.   The defendants Plaintiffs have sued. ....................................................................... 11

       1.   The *Monell* defendants.................................................................................. 11

       2.   The supervisor defendants. ........................................................................... 12

       3.   The individual defendants............................................................................. 13

LEGAL STANDARD............................................................................................................ 13

ARGUMENT........................................................................................................................ 14

   A.   The Complaint adequately alleges a *de facto* policy within LaSalle of providing inadequate medical care.......................................................................................... 15

   B.   LaSalle's one-facility rule has no basis in *Monell* and misreads its own authority. ............................................................................................................... 21

   C.   The LaSalle defendants' various corporate and supervisory arguments are unavailing.............................................................................................................. 24

       1.   The Complaint pleads claims against the "web" of entities known as LaSalle.25

   D.   The Complaint adequately alleges claims against the supervisor defendants. ........ 29

   E.   The Complaint's state-law claims should not be dismissed. ................................... 32

   F.   The Complaint adequately alleges claims against Defendant Gwen Warren. ......... 33

CONCLUSION.................................................................................................................... 34

## TABLE OF AUTHORITIES

### Cases

*Amos v. Cain,* No. 4:20-cv-7, 2020 WL 6688864 (N.D. Miss. Nov. 12, 2020) .........................24

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)...............................................................................13

*Baker v. Putnal,* 75 F.3d 190 (5th Cir. 1996) ......................................................................13

*Barnes v. City of El Paso,* 677 F. Supp. 3d 594 (W.D. Tex. 2023)...........................................17

*Beachem v. LaSalle Corr. LLC,* No. 3:21-CV-00299 (W.D. La.) ...............................................9

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).......................................................13, 14

*Bennett v. City of Slidell,* 728 F.2d 762 (5th Cir. 1984) (en banc) .....................................17, 20

*Bennett v. City of Slidell,* 735 F.2d 861 (5th Cir. 1984) (per curiam).......................................15

*Bond v. Nueces Cnty.,* No. 20-40050, 2022 WL 4595000 (5th Cir. Sept. 30, 2022)............17, 22

*Bost v. Wexford Health Sources, Inc.,* No. 15-cv-3278, 2020 WL 1890506 (D. Md. Apr. 15, 2020) ...............................................................................................................................24

*Boyer v. Advanced Correctional Healthcare, Inc.,* No. 20-cv-1123, 2023 WL 3978147 (W.D. Wis. June 13, 2023) ..............................................................................................24

*Burge v. Parish of St. Tammany,* 187 F.3d 452 (5th Cir. 1999) ..................................................15

*Burge v. St. Tammany Parish,* 336 F.3d 363 (5th Cir. 2003) ...............................................15, 17

*Cantu v. Guerra,* No. 20-cv-0746, 2021 WL 2636017 (W.D. Tex. June 25, 2021).......14, 29, 33

*Carter v. Derr,* No. 3:18-cv-00068 (W.D. La.) ......................................................................6

*Cicalese v. Univ. of Texas Med. Branch,* 924 F.3d 762 (5th Cir. 2019)...................................13

*Estate of Cross v. Turn Key Health Clinics, LLC,* No. 1:22-cv-03143, 2024 WL 4444446 (D. Colo. Oct. 8, 2024).........................................................................................................24

*Funk v. Stryker Corp.,* 631 F.3d 777 (5th Cir. 2011)............................................................. fn.2

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305 (5th Cir. 2002)..13

*Greathouse v. Sw. Corr. LLC,* No. 5:21-cv-00002 (E.D. Tex.)....................................................8

*Harold H. Huggins Realty, Inc. v. FNC, Inc.,* 634 F.3d 787 (5th Cir. 2011) ............................13

*Herr v. Armor Correctional Health Services, Inc.,* No. 6:19-cv-394, 2019 WL 12021672 (M.D. Fla. Sept. 9, 2019) ..................................................................................................23

*Hershey v. Energy Transfer Partners, L.P.,* 610 F.3d 239 (5th Cir. 2010) ...............................13

*Houser v. LaSalle Mgmt. Co., LLC,* No. 5:16-cv-00129 (E.D. Tex.) ..........................................6

*Jenkins v. Rankin Cnty., Mississippi,* No. 3:23-CV-374, 2024 WL 3526903 (S.D. Miss. July 24, 2024) ..................................................................................................................18, 20, 21

*Jones v. Sw. Corr., LLC,* No. 5:19-cv-00104 (E.D. Tex.) ...........................................................7

*Joseph v. Franklin,* No. 1:22-CV-03198, 2023 WL 5746938 (W.D. La. Aug. 21, 2023)..........27

*Kentucky v. Graham,* 473 U.S. 159 (1985)........................................................................11, 26

*Leal v. McHugh,* 731 F.3d 405 (5th Cir. 2013)........................................................................14

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993)15

*Mack v. City of Abilene,* 461 F.3d 547 (5th Cir. 2006)..............................................................15

ii

*Martinez v. Nueces County,* 71 F.4th 385 (5th Cir. 2023) ...............................................21, 22, 23

*Mathis v. Sw. Corr. LLC et al.,* No. 5:20-cv-00146 (E.D. Tex.) ..................................................7

*McElvy v. S.W. Corr. LLC,* No. 3:19-cv-1264 (N.D. Tex.) .........................................................4

*Meadowbriar Home for Children, Inc. v. Gunn,* 81 F.3d 521 (5th Cir. 1996) ...........................15

*Miller v. Carson,* 563 F.2d 757 (5th Cir. 1977)........................................................................20

*Minshew v. Brown,* No. 95-cv-2507, 1996 WL 3916 (E.D. La. Jan. 4, 1996)............................14

*No. 1 Fan Co., LLC v. Pepco Lic. Prod., Inc.,* No. 09-cv-1029, 2011 WL 13269165 (W.D. Tex. Mar. 16, 2011)..........................................................................................................14

*Petterson v. City of Fort Worth,* 588 F.3d 838 (5th Cir. 2009) .................................................17

*Pineda v. City of Houston,* 291 F.3d 325 (5th Cir. 2002).................................................18, 30, 31

*Robinson v. Pytlewski,* No. 19-cv-1025, 2022 WL 2359359 (D. Md. June 30, 2022) ...............24

*Rowland v. Sw. Corr., LLC,* No. 4:20-cv-00847, 2021 WL 4206409 (E.D. Tex. Aug. 17, 2021)27

*Sabbie v. S.W. Corr., LLC,* No. 5:17-cv-113 (E.D. Tex.) ........................................................5, 20

*Shadrick v. Hopkins County,* 805 F.3d 724 (6th Cir. 2015)...................................................23, 24

*Shields v. Prince George's County,* No. 15-cv-1736, 2016 WL 4581327 (D. Md. Sept. 1, 2016)23

*Spell v. McDaniel,* 824 F.2d 1380 (4th Cir. 1987)...................................................... fn.3

*Taylor v. Charter Med. Corp.,* 162 F.3d 827 (5th Cir. 1998)................................................ fn.1

*Wilson v. Birnberg,* 667 F.3d 591 (5th Cir. 2012) ................................................................13, 14

*Wooten v. La Salle Corr.,* No. 7:22-CV-000148, 2024 WL 5080246 (M.D. Ga. Dec. 11, 2024)27

*Yara v. Perryton Indep. Sch. Dist.,* 560 F. App'x 356 (5th Cir. 2014) ......................................30

*Young v. Caesars Ent., Inc.,* No. 22-cv-5331, 2023 WL 3295600 (W.D. La. May 5, 2023) .....14

*Zavala v. City of Natalia,* No. 06-cv-585, 2007 WL 321381 (W.D. Tex. Jan. 29, 2007) ..........18

## Statutes and Rules

42 U.S.C. § 1983............................................................................................................ passim

Fed. R. Civ. P. 8(a)(2)...................................................................................................13, 35

Fed. R. Civ. P. 12(b)(6)................................................................................................... passim

Fed. R. Civ. P. 12(c) ............................................................................................................13

Fed. R. Evid. 201 .....................................................................................................fn.1, fn.2

Fed. R. Evid. 408 ........................................................................................................... fn.3

iii

## INTRODUCTION[1]

This case arises from the death of Jaleen Anderson, who suffered a series of escalating seizures over two days at a private jail operated by the LaSalle defendants and died after staff there refused to send him to a hospital. The defendants do not dispute that the Complaint adequately alleges deliberate indifference to Mr. Anderson's serious medical needs. Their motions instead attack the Complaint's *Monell* and supervisory-liability theories.  Each of their arguments fails, however.

First, they contend the Complaint alleges too few incidents to establish a pattern. But that argument imports a summary-judgment evidentiary standard into the pleadings, ignores that flagrant violations like the ones identified in the Complaint require only a short pattern, and overlooks the Complaint's allegations of catastrophic deaths, multimillion-dollar settlements, and government investigations documenting hundreds of failures that provide ample notice of unconstitutional policies and practices. The Complaint amply pleads a company-wide custom of deliberate indifference to serious medical needs.

Second, the defendants urge a "one-facility rule," asking the Court to disregard every allegation of misconduct that occurred in a LaSalle facility, but not the precise facility where Mr. Anderson died. No such rule exists. Courts in the Fifth Circuit and across the country recognize that a corporation operating across multiple facilities may indeed have company-wide practices that are unlawful, and that incidents at its other facilities are probative of those customs, making them relevant under *Monell*.

---

[1] Plaintiff moved for leave to file an omnibus motion with excess pages in response to Defendants' three motions. ECF 90.

Third, the LaSalle defendants retreat into their corporate form, claiming the Complaint does not pinpoint each entity's role. Courts have repeatedly refused to let LaSalle's tangled web of entities defeat valid claims, and the Complaint's official-capacity claims against the individual defendants reach the full LaSalle enterprise in any event.

The remaining arguments—concerning supervisory liability, veil-piercing, group pleading, failure to train, the state-law claims, and Defendant Warren—fare no better. The defendants' motions should be denied.

## FACTUAL BACKGROUND

This action arises from the death of Jaleen Anderson at a private jail facility operated by the defendants in Olla, Louisiana.

### A.    Jaleen Anderson's death at a LaSalle facility.

Jaleen Anderson was a 29-year-old resident of Houston, Texas. ECF 1 ¶ 30. In March 2024, he was arrested in Houston on a drug possession charge and was confined to the Harris County jail to await adjudication. *Id.* ¶¶ 31-32. Harris County had an outsourcing contract with LaSalle, which operates private jails, and on March 22, 2024, Mr. Anderson was transferred from the Harris County jail to a LaSalle facility in Louisiana. *Id.* ¶¶ 33-34.

Around 6:03 a.m. on April 2, 2024, Mr. Anderson suffered a seizure. ECF 1 ¶ 36. Fellow detainees alerted guards and a "code blue" was called. *Id.* ¶¶ 37-38. Defendant LPN Gwen Warren responded and saw that Mr. Anderson had urinated on himself. *Id.* ¶ 43. But Ms. Warren did not provide medical care, did not attempt to obtain an assessment or diagnosis for the cause of the seizure, and did not alert a doctor or equivalent medical practitioner about the seizure. *Id.* ¶¶ 44-46. Instead, Mr. Anderson was taken to shower and returned to his bunk. *Id.* ¶ 47.

At around 6:01 a.m. on April 3, 2024, Mr. Anderson had another seizure, fell to the floor, and was escorted to the infirmary after another code blue. ECF 1 ¶¶ 48-50. He waited nearly four

2

hours before being seen by Defendant NP Shannon Brewer, but when she saw him, Ms. Brewer did not order transport to the hospital and did not attempt to obtain an assessment, a diagnosis, or treatment. ECF 1 ¶¶ 53-57. Instead, she ordered him placed in a "medical observation" cell, a room where guards would "monitor" patients by occasionally glancing in as they made rounds. *Id.* ¶¶ 58, 60-61.  Mr. Anderson remained there, alone, from 10:34 a.m. to 5:39 p.m. *Id.* ¶¶ 58-59.

Shortly before 5:39 p.m., Mr. Anderson suffered another seizure, during which he vomited and urinated on himself. ECF 1 ¶¶ 63-64. As he was escorted to a restroom, he lowered himself to the ground in visible pain and required physical support from guards to walk. *Id.* ¶ 68. At approximately 5:41 p.m., he had yet another seizure in the restroom and a code blue was called. *Id.* ¶ 69. Defendant Officer Mariah Dickey, Lieutenant Charles Love, and other officers responded. *Id.* ¶ 70. Dickey called Defendant LPN Denise Finlay, who said he was faking and instructed that he be put back in his cell. *Id.* ¶¶ 72-73. Finlay is not a doctor, lacked the training to determine whether the symptoms reflected malingering *or* a serious medical condition, yet she made no attempt to determine the cause of the seizures or any health risk. *Id.* ¶¶ 74-76.

At 5:58 p.m. Mr. Anderson was wheeled to a medical observation cell with a camera, where he sat breathing heavily with his hand on his chest. ECF 1 ¶¶ 77-78. At around 7:05 p.m., he vomited continuously for thirty seconds while suffering another seizure; no staff member came to his aid. *Id.* ¶¶ 79-80. He stumbled to the door, knocked repeatedly, and appeared visibly disoriented on camera. *Id.* ¶¶ 81-82. At around 7:11 p.m. Mr. Anderson collapsed on the floor, waved at the camera for help, and remained on the concrete in visible distress, breathing heavily, and unable to lift himself up. *Id.* ¶¶ 83-86. When guards arrived, reporting officers noted that his bunk was soaked and that the vomit on the floor contained blood. *Id.* ¶¶ 87-89. Guards had to lift Mr. Anderson into a wheelchair, in which he sat in a coiled position. *Id.* ¶¶ 90-92.

3

Back at the medical clinic, Dickey again called Finlay, who instructed her not to send Mr. Anderson to the hospital and instead to give him 50 mg of Zoloft. ECF 1 ¶¶ 93-95. While being transported, Mr. Anderson suffered more vomiting and more seizures. *Id.* ¶ 97. Another code blue was called at 7:35 p.m. *Id.* ¶ 98. Finlay was notified several times; at approximately 7:47 p.m., she told Dickey over the phone that inmates are not sent to the hospital for seizures. *Id.* ¶¶ 99-100. Sergeant Raspberry and Lieutenant Love then called Finlay directly to authorize EMS, but Finlay told them: "We don't send people to the hospital for seizures." *Id.* ¶ 102. Lieutenant Love called on-duty warden Defendant Lieutenant Morehead, who told the guards to follow Finlay's instructions. *Id.* ¶¶ 103-104. Morehead also called Defendant Assistant Warden Paul Smith—the highest-ranking staff member contacted—who likewise refused to authorize hospital transport. *Id.* ¶¶ 105-107. Smith and/or Morehead instructed Lieutenant Love to put Mr. Anderson back in his cell and keep an eye on him. *Id.* ¶ 108. Neither had medical training for evaluating or treating seizures. *Id.* ¶ 109. No one took Mr. Anderson to a hospital or to a medical doctor about his seizures. *Id.* ¶ 110.

At around 8:03 p.m., Mr. Anderson began to convulse, vomit, and lose consciousness, and another code blue was called. ECF 1 ¶¶ 111-112. Defendant Dickey laughed as she stood over the unresponsive Mr. Anderson, while other officers were attempting to locate a pulse but could not do so. *Id.* ¶¶ 114-115. At 8:13 p.m., Lieutenant Love called an ambulance. *Id.* ¶ 116. At 8:26 p.m., Defendant Charlotte Fussell—the Health Service Director of the Olla LCC, who is not a medical doctor—told Dickey that Mr. Anderson was faking, that she and Brewer had evaluated him earlier and he was fine, and that he was "going to stay up all night having seizures," and instructed Dickey not to send him to the hospital. *Id.* ¶¶ 119-120. Neither Fussell nor Brewer made efforts to determine whether Mr. Anderson's symptoms reflected malingering

4

or a serious medical condition, and indeed they were not qualified to do so. *Id.* ¶¶ 121-122. At 8:29 p.m. Mr. Anderson was transported to Hardtner Medical Center. *Id.* ¶ 123. He was pronounced dead there at 8:59 p.m. *Id.* ¶ 124.

**B.      The LaSalle / *Monell* defendants' practice of providing inadequate medical care to people in their care, and the indifference of supervisors to that practice.**

The Complaint alleges that the failure to provide Mr. Anderson with appropriate medical care was not an isolated incident, but rather was driven by the *Monell* defendants' policies and widespread practices, and the indifference of the supervisor-defendants which permit and tacitly endorse such unlawful treatment. ECF 1 ¶¶ 13-19, 126, 20-28, 159-165, 166-173.

Plaintiffs here first describe first the substantive allegations, and then describe the *Monell* and supervisor defendants they have sued.

The Complaint alleges that the inadequate care that Mr. Anderson received was driven by the policies and practices of LaSalle.  ECF 1 ¶ 126.  The Complaint explains that LaSalle has contracts with multiple jailors (including but not limited to Harris County) to house and provide healthcare to their detainees across various jails, *id.* ¶ 127, and was therefore responsible for their medical care, *id.* ¶¶ 128-129.  The Complaint goes on to note, however, that prior to the events involving Mr. Anderson, LaSalle had notice of policies and widespread practices throughout its jails pursuant to which people in LaSalle's custody would receive inadequate healthcare for serious medical needs.  *Id.*¶ 130.  Elaborating, the Complaint alleges that it is common within LaSalle facilities to see detainees with clear symptoms of serious medical need and whose medical records reflect an obvious need for treatment and yet for whom medical treatment is routinely delayed or completely ignored by medical and correctional employees.  *Id.* ¶ 131.  Yet despite this common phenomenon, alleges the complaint, LaSalle did nothing to ensure that

5

detainees and prisoners in LaSalle jails received adequate medical care and access to medical care. *Id.* ¶ 132. That, the complaint alleges, constitutes deliberate indifference. *Id.*

The Complaint then goes on to identify seven specific policies and practices that cause detainees to unconstitutionally inadequate healthcare. ECF 1 ¶ 133. The allegations are factually specific. The Complaint alleges that (1) healthcare personnel commonly fail to respond or follow up on complaints by detainees and prisoners about their health status; (2) detainees are left in "observation" cells where no care or assessment is provided; (4) healthcare personnel fail to take action to secure appropriate continuity of care for complicated and urgent conditions; (5) low-level nurses, including licensed vocational nurses and licensed practical nurses, are allowed to practice outside of their medical licenses and address life-threatening ailments that they are not licensed or qualified to assess or to treat; (6) guards are under-trained, and are not trained regarding their obligations with respect to medical care, and are instructed not to seek outside medical care so long as a detainee is alive and breathing, and are prohibited from calling 911 for medical emergencies without supervisory permission; and (7) healthcare and administrative personnel fail to refuse to arrange for detainees to be treated in outside facilities, even when an outside referral is necessary or proper. *Id.*

Having identified these policies, the Complaint then goes on to provide examples of those policies and practices in operation. *See id.* ¶ 139. Plaintiffs outline those examples below:

**Greg McElvy (2013).** Greg McElvy, an inmate at a LaSalle facility, began exhibiting symptoms that indicated life-threatening illness, including vomiting, not eating, not drinking, self-defecating, self-urinating, respiratory distress, and abnormal blood pressure. ECF 1 ¶ 139(d). Over the course of three days, he, other inmates, and one guard reported to LaSalle medical staff that he was dying and implored that he receive immediate medical attention. Id. He was not

6

taken to a hospital or medical doctor, and was ultimately found unresponsive in a pool of vomit

and died of acute bronchopneumonia and asthmatic complications. *Id*.  The Court may take

judicial notice[2] of the fact that Mr. McElvy's death was also the subject of a *Monell* lawsuit

against LaSalle in 2013.  *See McElvy v. S.W. Corr. LLC*, No. 3:19-cv-1264 (N.D. Tex.). [3]

**Ronald Beesley (2015).** Mr. Beesley died in the same LaSalle facility as Mr. McElvy in

2015 after reporting chest pain and swelling in his limbs to LaSalle staff. ECF 1 ¶ 139(e). His

wife visited him the day before his death and, after observing that he could barely walk or talk,

contacted a LaSalle official to express that he was severely ill and needed medical attention. Id.

Mr. Beesley had a chest infection that could have been diagnosed and treated with antibiotics,

but he was never taken to the hospital, was not monitored by LaSalle staff, was not medically

treated by LaSalle staff, and consequently died in the LaSalle facility. *Id*.

**Michael Sabbie (2015)**. Michael Sabbie died in 2015 after LaSalle staff failed to provide

medication and treatment for his heart disease and diabetes. ECF 1 ¶ 139(f). LaSalle staff knew

that Mr. Sabbie had many chronic and serious medical conditions and placed him in a medical

observation cell, yet they did not give him medication, monitor him, or refer him to the

appropriate medical providers. *Id*. Throughout his time at the LaSalle facility, staff falsified his

medical and observation records, practiced outside the scope of their licenses, and accused him

---

[2] "[A] court may take judicial notice of a document filed in another court to establish the fact of such litigation and related filings[.]" *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998) (quotation omitted; cleaned up).

[3]  It is permissible at the pleading stage for a district court to consider matters subject to judicial notice.  *Cf. Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) ("When reviewing a motion to dismiss, a district court must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." (quotation omitted)).

7

of faking his condition. *Id*. The staff responsible for his safety and medical care did not receive proper training. *Id*. His death was the subject of a well-publicized lawsuit and a 169-page report opinion denying LaSalle's summary judgment motion and detailing the widespread unconstitutional deficiencies at one of LaSalle's jails. *Id*. (citing *Sabbie v. S.W. Corr., LLC*, No. 5:17-cv-113, ECF 122 (E.D. Tex. Mar. 6, 2019)). Despite this published decision, LaSalle made no policy changes and took no other steps to correct the unconstitutional conditions, actions, and practices that led to Mr. Sabbie's death. *Id*.

**Morgan Angerbauer (2016).** The complaint alleges that 20-year-old Morgan Angerbauer died in a LaSalle facility in Texas due to almost the exact same conditions that caused Mr. Sabbie's death. ECF 1 ¶ 139(g). Ms. Angerbauer had chronic medical needs, but instead of being given care she was—like Mr. Anderson—assigned to an observation cell, where she was not given her medication and not appropriately monitored. *Id*. She was accused of faking her conditions and, even as she banged on her cell door for hours, was never referred to a hospital or medical doctor for an evidently life-threatening medical condition. *Id*. As with Mr. Sabbie, the LaSalle facility was not appropriately staffed to address Ms. Angerbauer's medical needs, and the staff that was there were not trained and/or acted consistently with the widespread unconstitutional practices within LaSalle's culture. *Id*. The Court may take judicial notice that Ms. Angerbauer's death was also the subject of a *Monell* lawsuit against LaSalle. *See Houser v. LaSalle Mgmt. Co., LLC*, No. 5:16-cv-00129 (E.D. Tex.).

**Jackson Parish Correctional Center (2017).** A prisoner's lawsuit alleging that he did not receive appropriate medical after a fall resulted in a public $405,000 settlement with LaSalle. ECF 1 ¶ 139(b). The Court may take judicial notice of the fact that the lawsuit in question was

8

filed by Lane Carter, who alleged that the failure to provide adequate medical care lasted for months in 2017, and was captioned *Carter v. Derr*, No. 3:18-cv-00068 (W.D. La.).

**Stroke patient (2018).** In April 2018, LaSalle staff failed to render adequate medical care when a detainee suffered a stroke and was not provided emergency services or taken to the hospital for approximately 24 hours. ECF 1 ¶ 139(h).

**William Jones (2018).** Mr. Jones, a detainee at a LaSalle facility, was not provided medication, monitored, provided emergency medical services, or taken to the hospital after being beaten and injured. ECF 1 ¶ 139(i). LaSalle never transported him to the hospital; instead, they released him to his sister who called an ambulance. *Id*. By the time he got to the hospital, Mr. Jones was nearly dead and placed on a ventilator. *Id*. He was hospitalized for nearly a month. *Id*. His experience and injuries were the subject of a well-publicized lawsuit. *Id*. The Court may take judicial notice of that lawsuit, styled *Jones v. S.W. Corr., LLC*, No. 5:19-cv-00104 (E.D. Tex.).

**Holly Barlow-Austin (2019).** A few months after the issuance of the summary judgment opinion in *Sabbie*, Holly Barlow-Austin went blind after LaSalle employees failed to give her necessary medication. Her injuries were the subject of a highly publicized lawsuit, which resulted in a $7,000,000 settlement with LaSalle. *Id*. ¶ 139(a). The Court may take judicial notice that the lawsuit resulting in this settlement was a *Monell* action against LaSalle captioned *Mathis v. S.W. Corr. LLC et al.*, 5:20-cv-00146 (E.D. Tex.), which alleges that after going blind, Ms. Barlow-Austin died while still in LaSalle's custody, in June 2019.

**Franklin Greathouse (2019).** Mr. Greathouse, a detainee in a LaSalle facility, reported having a seizure to LaSalle staff, who accused him of faking it and refused to refer him to a medical doctor or hospital. ECF 1 ¶ 139(j). He died later the same day from a seizure. *Id*. State

9

investigators and authorities investigated his death and found that LaSalle was not in compliance with Texas jail standards, had failed to appropriately monitor Mr. Greathouse, and had falsified observation logs. *Id*. Even after those findings, the complaint alleges that LaSalle made no changes to its conditions, policies, or practices. *Id*.  The Court may take judicial notice that the death of Mr. Greathouse was also subject to a *Monell* lawsuit against LaSalle.  *See Greathouse v. S.W. Corr. LLC*, No. 5:21-cv-00002 (E.D. Tex.).

**Cecil Williams (2020).** Cecil Williams suffered an asthma attack at a LaSalle facility and was denied treatment and resuscitation efforts for over an hour after losing consciousness. ECF 1 ¶ 139(c). The Court may take judicial notice of the fact that this event was the subject of a *Monell* lawsuit against LaSalle alleging that the asthma attack that killed Mr. Williams occurred on July 9, 2020.  *See Beachem v. LaSalle Corr. LLC*, No. 3:21-CV-00299 (W.D. La.).

**Irwin County, Georgia.** The U.S. Senate's Permanent Subcommittee on Investigations investigated a LaSalle facility in Irwin County, Georgia, and found that numerous female detainees housed there were subject to "excessive, invasive, and often unnecessary gynecological procedures," including hysterectomies. ECF 1 ¶ 139(l). After Dawn Wooten, a nurse and former employee of LaSalle, reported unnecessary hysterectomies, LaSalle terminated her employment, and she filed a whistleblower lawsuit. *Id*. The investigation into the Irwin County facility revealed ***659 reports from detainees who described "delayed or deficient medical care"*** and found that LaSalle failed to take appropriate corrective action in response to these deficiencies. *Id*. The Irwin County facility's conditions were so far below minimum standards that Immigration and Customs Enforcement (ICE) was ordered to stop housing detainees there. *Id*.

10

**Texas Commission on Jail Standards**.  In addition to the foregoing incidents, the Complaint alleges that since 2015, LaSalle jails in Texas have been subject to multiple findings of non-compliance by the Texas Commission on Jail Standards. *Id.* ¶ 151.

\*      \*      \*

The Complaint alleges that LaSalle is indifferent to the foregoing practices, despite their catastrophic outcomes, because doing so minimizes costs, enabling LaSalle to submit low bids to win contracts with municipalities and thereby obtaining revenue.  ECF 1 ¶¶ 140-142.

**C.      The defendants Plaintiffs have sued.**

Plaintiffs have sued sixteen defendants. Several of those defendants (Paul Smith, Lt. Morehead, Charlotte Fussell, Shannon Brewer, Gwen Warren, Denise Finlay, and Mariah Dickey, *see* ECF 1 ¶¶ 21, 22, 24-29) were directly and personally involved in the events that led to Mr. Anderson's death, and with one exception discussed herein, the defendants' present motions do not seek to dismiss the claims against them. Plaintiff also alleged claims against Harris County and Ed Gonzalez, which are not subject to the instant motions.

The remaining defendants fall into two categories: *Monell* defendants, and supervisor-defendants.  Plaintiffs describe the claims against these defendants below.

**1.   The *Monell* defendants.**

The Complaint identifies three corporate entities by name:  LaSalle Corrections LLC, which, the Complaint alleges, "maintains, manages, and operates at least eighteen jails throughout [several] states," (ECF 1 ¶ 14), LaSalle Management Company LLC, which is "responsible for the operations and employees at various LaSalle facilities," (*id.* ¶ 15), and LaSalle Correctional Center LLC, which operates the particular facility where Mr. Anderson died (*id.* ¶ 13).  The complaint refers to these three corporate defendants as "LaSalle." *Id.* ¶ 16.

11

That does not complete the list of *Monell* defendants, however. The Complaint additionally names Clay and William McConnell, who own LaSalle "and additional corporate entities affiliated with LaSalle," alleges that both men, in addition to being owners, exercise ultimate control and policymaking authority regarding LaSalle's operations, and sues both men in their official capacities (and as supervisors, *infra*). ECF 1 ¶¶ 18-19. The complaint also names each other individual defendants in their official (as well as individual) capacity. *Id.* ¶¶ 20-29. The complaint names each of these individuals as defendants in their official capacities pursuant to the doctrine, articulated in *Kentucky v. Graham*, 473 U.S. 159 (1985), that official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." 473 U.S. at 165.

## 2. The supervisor defendants.

As relevant here, the Complaint identifies Clay and William McConnell, John Stuckey, and Pamela Hearn, in their individual capacities, as supervisor-defendants. ECF 1 ¶ 167. The Complaint alleges that the McConnells "exercise ultimate control over and policymaking authority regarding LaSalle's policies and practices" relating to medical care, *id.* ¶¶ 19, 144, 146, and that they are aware of LaSalle's practices of providing inadequate medical care, *id.* ¶ 140, but were indifferent to them and the risks they posed *id.* ¶ 147.

The Complaint also alleges that Dr. Hearn is the Medical Director for LaSalle and for the Olla facility, that she was aware of LaSalle's practices of providing inadequate medical care, *id.* ¶ 136, and that she encouraged or was indifferent to the widespread practices of inadequate medical care alleged in the complaint. *Id.* ¶¶ 23, 136, 168, 170. It alleges John Stuckey is warden of the Olla facility, *id.* ¶ 20, was likewise aware of the practice of providing inadequate medical care, *id.* ¶ 136 but did not take steps to prevent it, *id.* ¶¶ 136, 168, 170.

12

3. **The individual defendants.**

The complaint also names as defendants several individuals who were directly involved in Mr. Anderson's care or who gave direct instructions relating to his care. *See* ECF 1 ¶¶ 21-22, 24-28. With one exception—Defendant Gwen Warren—those defendants have not brought dismissal motions.

## LEGAL STANDARD

The standard for deciding a motion under Rule 12(c) is the same as the one for deciding a motion under Rule 12(b)(6). *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 n.8 (5th Cir. 2002). Under either motion the district court's task is to examine the allegations made in the complaint. "To survive a Rule 12(b)(6) motion to dismiss, [a plaintiff's complaint] need only include a short and plain statement of the claim showing that the pleader is entitled to relief." *Hershey v. Energy Transfer Partners., L.P.*, 610 F.3d 239, 245 (5th Cir. 2010) (punctuation omitted) (quoting Fed. R. Civ. P. 8(a)(2)). The plaintiff cannot rest on bare conclusions; the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Even so, this "plausibility standard is not akin to a probability requirement . . . a complaint may not be dismissed unless it is beyond doubt that [the plaintiff] cannot prove a plausible set of facts to support his allegations." *Wilson v. Birnberg*, 667 F.3d 591, 600 (5th Cir. 2012) (quotation omitted).

When considering a Rule 12(b)(6) motion to dismiss, the Court must accept as true all well-pleaded facts contained in the complaint and view them in the light most favorable to the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). "Dismissal is improper if the allegations support relief on any possible theory. The question at the motion to dismiss stage is

13

whether, with every doubt resolved in the pleader's behalf, the complaint states any legally cognizable claim for relief." *Wilson*, 667 F.3d at 595 (internal quotation marks and citations omitted). A complaint " 'does not need detailed factual allegations' " to clear this bar, *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely.' " *Leal v. McHugh*, 731 F.3d 405, 413 (5th Cir. 2013) (quoting *Twombly*, 550 U.S. at 556).

What is more, "[t]he moving party has the burden under a Rule 12(b)(6) motion to dismiss." *Young v. Caesars Ent., Inc.*, No. 22-cv-5331, 2023 WL 3295600, at *2 (W.D. La. May 5, 2023). This is "a very heavy burden" *Minshew v. Brown*, No. 95-cv-2507, 1996 WL 3916, at *1 (E.D. La. Jan. 4, 1996), since it "means that, despite the natural focus on the allegations of the operative pleading," courts "may find conclusory statements insufficient to support dismissal under Rule 12(b)(6), especially when the movant disregards relevant portions of the operative pleading." *Cantu v. Guerra*, No. 20-cv-0746, 2021 WL 2636017, at *1 (W.D. Tex. June 25, 2021). Movants also do not carry their burden when they fail to present "argument or authority for the plaintiffs to refute or [the] Court to consider.*" # 1 Fan Co., LLC v. Pepco Lic. Prod., Inc.*, No. 09-cv-1029, 2011 WL 13269165, at *2 (W.D. Tex. Mar. 16, 2011).

## ARGUMENT

As Plaintiffs have set out above, the Complaint charges that Mr. Anderson was provided with flagrantly inadequate medical care for his seizures and died as a result. Indeed, the defendants do not challenge that the Complaint's allegations would set out a case of deliberate indifference towards Mr. Anderson's serious medical needs. Instead, the defendants make a series of claims focused on the Complaint's *Monell* and supervisory liability claims. As set forth below, however, those arguments are unavailing, and the motions should be rejected.

14

**A.      The Complaint adequately alleges a *de facto* policy within LaSalle of providing inadequate medical care.**

A "municipality" like the LaSalle defendants may be liable for violating a person's constitutional rights "in at least three different ways." *Burge v. Parish of St. Tammany*, 187 F.3d 452 (5th Cir. 1999) (*Burge I*). Liability may flow from (1) implementation of an official policy; (2) a policymaker's misconduct; or (3) widespread practices that, although not authorized by an official policy, are so common and well-settled as to constitute a custom that fairly represents policy. *Id.*; *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003) (*Burge II*) (citing *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (per curiam)).

Whichever route or routes a plaintiff urges, he must "plead facts which show 1) a policy or custom existed; 2) the governmental policy makers actually or constructively knew of its existence; 3) a constitutional violation occurred; and 4) the custom or policy served as the moving force behind the violation." *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 532-33 (5th Cir. 1996).  In adjudicating a motion to dismiss, courts in this district have held that a *Monell* claim is sufficiently pleaded if it satisfies the liberal standard of Rule 8(a), giving "the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Mack v. City of Abilene*, 461 F.3d 547, 556 (5th Cir. 2006) (reversing dismissal of *Monell* claim where plaintiff alleged "a policy and/or custom" of inadequate supervision and training which gave city employees reason to believe unconstitutional misconduct would be tolerated) (citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)).

The constructive knowledge implicated by this standard generally requires "a pattern of similar violations." *Burge II*, 336 F.3d at 370 (quotation omitted).  Considerable care, however, is required in assessing this requirement at the pleading stage.  As an initial matter, the procedural posture of the case is critical.  For the proposition that the Complaint does not

15

identify sufficient incidents to establish a pattern the defendants cite *Petterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009).  ECF 73-1 at 11.  "But critically, the Fifth Circuit reached [its holding in *Peterson*] at the summary judgment stage." *Barnes v. City of El Paso*, 677 F. Supp. 3d 594, 609 (W.D. Tex. 2023).  Indeed, the Fifth Circuit itself has emphasized that "in . . . *Peterson* . . . [the Court of Appeals] was concerned with what a 'reasonable jury could conclude' based on the evidence introduced by a plaintiff after a reasonable opportunity for discovery." *Bond v. Nueces Cnty.*, No. 20-40050, 2022 WL 4595000, at *7 (5th Cir. Sept. 30, 2022).  By contrast, "at the pleading stage, where no discovery has been conducted, a plaintiff need only "allege[] enough to create a reasonable inference that a policy exists." *Id.* Accordingly, the Court of Appeals has repeatedly cautioned district courts against relying on "cases dismissed on summary judgment [to support] dismissal of [] cases at the pleadings stage." *Id.* (collecting cases).  At the pleading stage, the quantum of cases is considerably different because the question at summary judgment is "what 'evidence' must be introduced to *prove a pattern*," whereas the pleading stage concerns "what must be alleged to plausibly claim that a pattern exists." *Id.* at *6 (emphasis original; citation omitted).

Additionally, constructive knowledge is not a matter of adding up incidents and deciding whether they cross a threshold.  Rather, "[c]onstructive knowledge of a custom by the policymaker 'may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities, and official duty of responsible policymakers to be informed, or combinations of these.'" *Zavala v. City of Natalia*, No. 06-cv-585, 2007 WL 321381, at *4 (W.D. Tex. Jan. 29, 2007) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 330 n.15 (5th Cir. 2002)).  For example, "where the violations are flagrant or severe, the fact finder will likely require a shorter pattern of the conduct to be satisfied that diligent governing body

16

members would necessarily have learned of the objectionable practice and acceded to its continuation." *Bennett v. City of Slidell,* 728 F.2d 762, 768 (5th Cir.1984) (*en banc*).  Such evidence considerably compresses the number of incidents required to establish a municipal practice.  In *Jenkins v. Rankin Cnty., Mississippi*, No. 3:23-CV-374, 2024 WL 3526903 (S.D. Miss. July 24, 2024), for example, ***three*** prior incidents over 13 years were sufficient, given their flagrant nature and the "casual impunity" with which they were performed.  *Id.* at **5-7.

The Complaint's allegations satisfy this standard:  Greg McElvy died of pneumonia and asthma after three days of begging for help. Ronald Beesley died of a treatable chest infection. Michael Sabbie died after staff accused him of faking heart disease and diabetes, and falsified records. Morgan Angerbauer died at age 20 after banging on her cell door for hours. Holly Barlow-Austin went blind and ultimately died after being denied medication. Franklin Greathouse died of a seizure on the same day that staff accused him of faking it. Cecil Williams died of an asthma attack after being denied resuscitation efforts. These are catastrophic and egregious medical failures.  The facts alleged about them indicate extraordinary deviations from any acceptable medical care.  A number of these medical catastrophes, moreover, gave rise to lawsuits in which the LaSalle corporate defendants themselves were sued—*for de facto policies of providing inadequate medical care.*  LaSalle was inarguably on notice regarding these claims, repeatedly reaching settlements that ran from several hundred to seven million dollars,[4] and yet

---

[4]  Federal Rule of Evidence 408 contemplates the use of settlements for this exact purpose. *See* Fed. R. Evid. 408 Committee Note (2006) (noting that Rule 408 does not prohibit using "evidence of the compromise . . . to prove notice. *See, e.g., . . . Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987) (in a civil rights action alleging that an officer used excessive force, a prior settlement by the City of another brutality claim was properly admitted to prove that the City was on notice of aggressive behavior by police officers)."). *Spell* was a *Monell* case that endorsed admission of an earlier police brutality settlement "to show, as an essential element of Spell's

17

more catastrophic outcomes followed.  These factual allegations permit a plausible inference that serious problems exist in LaSalle's delivery of medical care and that LaSalle's policymakers have been aware of the consequences of such practices, yet have been indifferent to them. Those are exactly the kind of "flagrant" and "severe" violations for which *Bennett* requires a "shorter pattern." 728 F.2d at 768.

That is not all.  The Complaint does not merely recount a handful of prior incidents. Several of the "examples" the Complaint identifies are not individual events, but rather recount formal investigations and adjudications that themselves document widespread, systemic deficiencies in LaSalle's provision of medical care.  The U.S. Senate's Permanent Subcommittee on Investigations, for example, did not merely identify a single bad outcome at LaSalle's Irwin County, Georgia facility; its investigation identified "***659 reports*** from detainees who described 'delayed or deficient medical care,' " ***and*** found that LaSalle failed to take appropriate corrective action. ECF 1 ¶ 139(*l*). The Texas Commission on Jail Standards has issued multiple findings of non-compliance against LaSalle's Texas facilities since 2015. *Id.* ¶ 151. And in *Sabbie*, a 169-page report and recommendation issued by the Magistrate Judge detailed widespread unconstitutional deficiencies at a LaSalle jail. *Id.* ¶ 139(f).

These are documented findings of pervasive failure pursuant to an official policy of denying and delaying medical care. They go directly to "the widespread extent of the practices" and the "general knowledge of their existence" that *Pineda* recognized as a basis for constructive knowledge. 291 F.3d at 330 n.15. They also go to "manifest opportunities and official duty of responsible policymakers to be informed." *Id.* The allegations in the complaint permit the

---

'condoned custom' theory of liability, that the City was sufficiently aware of the existence of a developed practice or custom of such conduct." 824 F.2d at 1400.

18

inference LaSalle policymakers were repeatedly told, through published judicial opinions, congressional findings, state regulatory determinations, and multimillion-dollar settlements, that its facilities were not providing constitutionally adequate care. The Complaint alleges that LaSalle nonetheless made no policy changes, conducted no meaningful internal reviews, and continued business as usual. ECF 1 ¶¶ 139(f), (g), (j); *id.* ¶ 147. That is precisely the kind of "deliberate inactivity" by policymakers that *Monell* was designed to reach. *See Miller v. Carson*, 563 F.2d 757, 761 n.8 (5th Cir. 1977).

What is more, *Monell* permits inferences about settled corporate practices to be drawn from the underlying event itself. Allegations that the employees who engaged in the underlying misconduct did so brazenly, for example, support an inference that they routinely engaged in similar misconduct and did not expect discipline for doing so. *See Jenkins*, 2024 WL 3526903, at *7 (explaining that the "casual impunity" with which the defendant-employees engaged in the underlying misconduct supported a *Monell* claim since it supported an inference that they "routinely did this kind of thing" and that they "expected no discipline and had nothing to fear" from doing so (quotation omitted)).

The conduct surrounding Mr. Anderson's death has compelling indications of a widespread practice. Multiple LaSalle nurses, separately assessing Mr. Anderson on different shifts, all responded the same, inappropriate way to the same obvious, serious symptoms: ignore the seizures, refuse to call an ambulance, make no other effort to secure a diagnosis, and accuse Mr. Anderson of faking. ECF 1 ¶¶ 43-46, 53-57, 72-76, 99-102, 119-120. When guards escalated the lack of medical care up the chain of command, two separate supervisors with no medical training, Lieutenant Morehead and Assistant Warden Smith, ratified that refusal. *Id.* ¶¶ 103-109.

19

Most telling of all is what Nurse Finlay said out loud. When Lieutenant Love and Sergeant Raspberry called her directly to authorize emergency medical services, Finlay told them: "We don't send people to the hospital for seizures." ECF 1 ¶ 102. She had earlier told Officer Dickey the same thing: that inmates are not sent to the hospital for seizures. *Id.* ¶ 100. There are two plausible interpretations of this statement, and each is damning. Either Finlay was describing a policy she understood to be settled within LaSalle, or she was so comfortable announcing a flagrantly unconstitutional position to her superiors and to correctional officers that she felt no need to disguise it. Each possibility independently supports the inference of a policy or custom. The first interpretation is direct evidence of an unwritten policy, which is precisely the kind of evidence *Monell* contemplates. The second reflects a situation closely analogous to comments by sheriff deputies who were part of a "Goon Squad" in *Jenkins*—there, the court reasoned that the "casual impunity" with which the officers spoke, openly, about misconduct supported "the reasonable inference that they routinely did this kind of thing," "expected no discipline" for doing so, and generally "had nothing to fear" engaging in a flagrantly unconstitutional act. 2024 WL 3526903 at *7. Those same inferences apply here.

In sum: the Complaint alleges multiple cases of catastrophic medical care across multiple LaSalle facilities that would have been known to LaSalle policymakers, many of which would certainly have been known to LaSalle policymakers since they were identified in lawsuits, and sometimes in large settlements. In addition, the Complaint identifies multiple reports and decisions documenting medical failures that were truly widespread, running into the hundreds of incidents. Certainly at the pleading stage this is enough to "plausibly claim that a pattern [of inadequate medical care] exists" within LaSalle facilities. *Bond*, 2022 WL 4595000, at *6.

20

**B.      LaSalle's one-facility rule has no basis in *Monell* and misreads its own authority.**

The LaSalle defendants contend that the Court can ignore the Complaint's robust allegations of LaSalle's company-wide policies, in their entirety.  The incidents are categorically irrelevant to a *Monell* claim, LaSalle says, because even if the practices they reflect are truly widespread and do reflect corporate usages or customs under *Monell*, none of them occurred at the particular facility where Mr. Anderson was housed.  *See* ECF 73-1 at 8-9.

That is not the law. No decision, including the Fifth Circuit authority LaSalle relies on, holds that a *Monell* claim against a multi-facility private corporation must be supported by incidents from the single facility where the plaintiff was housed. To the contrary, the weight of authority confirms that when a private corporation maintains company-wide customs and policies, incidents across that corporation's facilities are probative of those customs and policies that may have led to a particular constitutional violation.

LaSalle's principal authority, *Martinez v. Nueces County*, 71 F.4th 385 (5th Cir. 2023), does not establish the one-facility rule LaSalle asks this Court to adopt. Indeed, the opinion says no such thing. *Martinez* affirmed dismissal of a *Monell* claim against medical vendor Wellpath not because *Monell* forecloses reliance on incidents across multiple facilities, but rather because the plaintiff's complaint was sparse and conclusory. The Court expressly presumed "that a nationwide corporation . . . can be sued" under *Monell*, 71 F.4th at 391, provided the plaintiff "show[s] the existence of a policy or custom that was the moving force behind the violation of his constitutional rights." *Id.* The deficiency in *Martinez* was that "there [was] not enough detail in [the] complaint to clear this bar." *Id.* It was "unclear from the face of the complaint what exact role Wellpath even played at Nueces County," and the plaintiff had not even "allege[d], with sufficient detail, what happened to him at the jail." *Id.* at 391-92. The allegations failed not

21

because they were company-wide in scope, but because the "sparse complaint and conclusory allegations would not survive a motion to dismiss." *Id.* at 392.

The Complaint here bears no resemblance to the pleading in *Martinez*. It identifies LaSalle as a prison corporation operating at least 18 facilities, *see* ECF 1 ¶ 14, alleges in detail what happened to Mr. Anderson, *see supra* at pp. 2-5, pleads specific *de facto* policies implemented company-wide, *see supra* at pp. 5-6, identifies prior incidents and government investigations that would have put LaSalle's policymakers on notice of the danger attendant to their policies and practices, *see supra* at pp. 6-11, and connects those policies to the events that played out in Mr. Anderson's case. *Martinez* does not require more.

*Martinez*, indeed, is in line with courts across the nation, including courts in the Fifth Circuit, which consistently recognized that when a *Monell* claim is asserted against a corporate entity operating in multiple facilities, the entity's practices across those facilities are probative of company-wide policy. In *Shadrick v. Hopkins County*, 805 F.3d 724 (6th Cir. 2015), the Sixth Circuit held that on a *Monell* plaintiff's "argument that a pattern of tortious or unconstitutional conduct . . . existed, evidence about similar incidents of inmate deaths in jail facilities served by [a private vendor] may be relevant to whether [the vendor] acted with deliberate indifference to the medical needs of inmates with whom its nurses came into contact at [the particular jail where plaintiff's decedent was housed]." *Id.* at 744. The district court reached the same conclusion in *Shields v. Prince George's County*, No. 15-cv-1736, 2016 WL 4581327 (D. Md. Sept. 1, 2016), declining to dismiss a *Monell* claim against prison vendor Corizon despite the defendant's complaint that the alleged incidents were drawn from "14 different states" and that "none of these allegations relate to the facility or even the state at issue in this case." *Id.* at *8-9. The court reasoned: "Corizon is a company that provides healthcare services to state and county

22

correctional facilities and jails nationwide. Thus, its activities in a variety of states can be, and in this case are, relevant to the issue of custom and policy here." *Id.* at \*9. The court in *Herr v. Armor Correctional Health Services, Inc.*, No. 6:19-cv-394, 2019 WL 12021672 (M.D. Fla. Sept. 9, 2019), reached the same conclusion, holding that incidents of inadequate care by a private jail healthcare vendor "around the country" supported a claim that the vendor "has a policy or custom of repeated delayed or denied medical care that directly resulted in the constitutional violation and Mr. Herr's death." *Id.* at \*5.

Other courts have applied the same principle. In *Amos v. Cain*, No. 4:20-cv-7, 2020 WL 6688864 (N.D. Miss. Nov. 12, 2020), the court relied on *Shadrick* to hold that "incidents at other facilities may also establish deliberate indifference when the same policies are in place at those facilities such that the incidents should have alerted a policy maker to the inadequacy of the policies." *Id.* at \*4 (cleaned up). And in *Boyer v. Advanced Correctional Healthcare, Inc.*, No. 20-cv-1123, 2023 WL 3978147 (W.D. Wis. June 13, 2023), the court denied a motion to dismiss a *Monell* claim against a private jail healthcare vendor based in part on allegations about "the treatment of other detainees in [the vendor]'s care across the country." *Id.* at \*7.

Courts addressing the scope of permissible *Monell* discovery against multi-facility vendors have reached the same conclusion, treating the vendor's practices at other facilities as relevant evidence of the company-wide policies alleged to have caused the plaintiff's harm. *See, e.g.*, *Bost v. Wexford Health Sources, Inc.*, No. 15-cv-3278, 2020 WL 1890506, at \*16 (D. Md. Apr. 15, 2020) (holding, in a *Monell* action against a jail healthcare provider based on failure to provide emergency medical care at one jail, that relevant discovery included documents relating to the defendant's provision of emergency care at other facilities); *Robinson v. Pytlewski*, No. 19-cv-1025, 2022 WL 2359359, at \*12 (D. Md. June 30, 2022) (permitting multi-facility *Monell*

23

discovery because the statewide policy allegations "share the same core facts alleged in the original complaint—that [vendor-defendant] . . . failed to implement or enforce effective policies, which caused [the decedent's] suffering and death"); *Estate of Cross v. Turn Key Health Clinics, LLC*, No. 1:22-cv-03143, 2024 WL 4444446, at *9 (D. Colo. Oct. 8, 2024) (observing that "courts have ordered discovery of records concerning other inmates' deaths or serious injuries . . . without restricting the discovery to only one facility").

The reasoning of these decisions applies directly here. LaSalle is, as the Complaint alleges, a private corporation that takes custody of detainees and provides medical care across at least 18 facilities. The Complaint alleges that LaSalle's company-wide de facto policies—not policies unique to the facility where Mr. Anderson was housed—drove the inadequate care led to his death. Similar incidents at other LaSalle facilities and reports about widespread problems at those facilities are not irrelevant background. They are direct evidence that the company-wide policies Plaintiffs describe do exist and operate as alleged. If anything, that those incidents span multiple years, multiple facilities, and multiple employees, make it *more* plausible that LaSalle's leadership knew of and tolerated the practices Plaintiffs allege, and *more* plausible that the same practices operated at the facility where Mr. Anderson died.  LaSalle's company-wide practices are not only relevant, but highly probative of the policies, customs, and practices that led to LaSalle staff inexplicably ignoring Mr. Anderson's medical needs.

**C.    The LaSalle defendants' various corporate and supervisory arguments are unavailing.**

So: the Complaint, as set out *supra*, contains robust allegations of company-wide practices pursuant to which LaSalle employees ignore the serious medical needs of people in the company's custody.  And the law is clear that the company-wide claims about corporate practices that are alleged in the Complaint are relevant for *Monell* claims against companies like

24

LaSalle, which operate across multiple facilities.  And the Complaint alleges that a closely similar failure in medical care caused Mr. Anderson's death.  Those are the basic elements for establishing both *Monell* and supervisory liability, and ultimately the LaSalle defendants do not seriously contest them in their briefs.

Instead, the LaSalle defendants try to defend themselves with arguments focused on LaSalle's corporate form.  As Plaintiffs set out below, however, that line of defense is unavailing.  Courts have repeatedly rejected LaSalle's efforts to take shelter behind the welter of corporate entities erected by the company's owners, particularly at the pleading stage.  The corporate-form argument, moreover, simply ignores that the Complaint names the individual defendants in their official, as well as individual, capacities, thus effectively suing the corporate entities of which they are agents—not just the particular entities identified by name in the Complaint.  The defendants' other arguments, described below, are equally unavailing.  None of them counsel dismissal of the Complaint.

**1.  The Complaint pleads claims against the "web" of entities known as LaSalle.**

Count I of the Complaint sets out Plaintiffs' *Monell* claim.  *See* ECF 1 at 29.  It is asserted against each of the three "LaSalle" entities named in the Complaint, as well as each individual defendant in their official capacity.  *Id.*  Aside from pleading that these defendants had a custom of providing inadequate medical care to LaSalle detainees, *id.* ¶ 160, the count charges that policymakers for these defendants knew about and were indifferent to those customs, *id.* ¶¶ 161-62, allowing them to continue, *id.* ¶ 163, and that those customs were the driving force behind the inadequate medical care that Mr. Anderson received, *id.* ¶ 164.  The defendants make a series of arguments against these counts, but they are unavailing.

*First*, the two named corporate defendants that have filed motions to dismiss, LaSalle Management Co. ("LMC") and LaSalle Correctional Center, LLC ("LCC"), argue that the

25

Complaint has not identified their *precise* roles in this case. Operating from the premise that Plaintiffs' "claims must be sufficiently pled against each separate entity," ECF 73-1 at 4, LMC and LCC argue that the Complaint does not specify "any purported relationship or hierarchy among the different [LaSalle] entities," or "support their allegation that both [LMC and LCC] are somehow responsible for operating the [facility where Mr. Anderson was held] at the same time." *Id.* at 5. As a strict matter of the pleadings, these arguments are incorrect: the Complaint alleges that both LMC and LCC "operate" the facility where Mr. Anderson was held, *see* ECF 1 ¶¶ 14, 15, and the defendants do not explain why this allegation is insufficient, particularly at the pleading stage.

More broadly, however, this line of argument seeks to take refuge in LaSalle's corporate form. That is a gambit which multiple courts, including this one, have rejected. That is so because the "LaSalle Corrections" enterprise is made up of a "web of LaSalle entities." *Wooten v. La Salle Corr.*, No. 7:22-CV-000148, 2024 WL 5080246, at *3 (M.D. Ga. Dec. 11, 2024). The web is notoriously "complex," but all of which appear ultimately to be affiliated and commonly managed from a common headquarters in Ruston, Louisiana.[5] *Id.* Courts do not permit arrangements like this to thwart valid claims. Indeed multiple courts have rejected LaSalle's attempts to use its complex corporate structure to evade liability, *see Rowland v. Sw.*

---

[5] The *Wooten* court described "LaSalle Corrections" as follows:

> [A predecessor company's] evolution into the LaSalle Corrections of today is somewhat murky. It appears that since 1995, the LaSalle Corrections name has grown to be associated with 16 correctional facilities, and "a lot" of employees work at an office in Ruston, Louisiana. LaSalle is led by a "Corporate Management team" but the identities of the members or the size of the team is unclear. Likewise, the structure of the LaSalle Corrections apparatus, or even how many LaSalle Corrections entities there are, is not apparent . . . .

*Wooten,* 2025 WL 961435, at *7.

26

*Corr., LLC*, No. 4:20-cv-00847, 2021 WL 4206409, at \*7 (E.D. Tex. Aug. 17, 2021) (rejecting LaSalle's argument that plaintiffs had not named the correct LaSalle entity, noting that "Courts in this district have rejected the same or similar arguments presented by the [LaSalle] Corporate Defendants herein," and collecting said decisions relating to LaSalle entities). Indeed, this Court has rejected just such an argument by a LaSalle defendant and noted that the various LaSalle entities "may be liable as part of a single business enterprise[.]". *Joseph v. Franklin*, No. 1:22-CV-03198, 2023 WL 5746938, at \*5 n.5 (W.D. La. Aug. 21, 2023) (Perez-Montes, M.J. (citation omitted). And as this Court noted in *Joseph*, teasing out those corporate identities is a task for discovery. *Id*. (As Plaintiffs explain *infra*, that discovery is already underway and is currently the subject of Plaintiffs' motion to compel, *see* ECF 58 at 7-9.)

**Second**, and in all events, the arguments advanced by LMC and LCC are entirely unavailing because Plaintiff has named each of the individual defendants in their official capacities. This was not done as a matter of surplus drafting, but rather precisely because of the opaque and complex web of "LaSalle" entities involved in this and other cases. Naming each of the individual defendants in their official capacities ensures that all liable "LaSalle" corporate entities are defendants in this case, since "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity" of which the named individual is an agent. *Graham*, 473 U.S. at 166. The *Monell* defendants, in short, include, but are not limited to, the LaSalle corporate entities specifically identified in the Complaint, as well as additional affiliated entities who are liable through the Complaint's official-capacity claims against the individual defendants.[6]

---

[6] There is good reason to think that such additional entities are defendants in this case. Consider Dr. Pamela Hearn. Dr. Hearn is named as a defendant in this case, as LaSalle's

It is for this reason, too, that the defendants are wrong to argue that the official-capacity claims in this argument are duplicative of the claims against LMC and LCC. *See* ECF 74-1 at 11; ECF 75-1 at 4-5. On this topic, the defendants talk out both sides of their mouths. On the one hand, LMC and LCC argue that the claims against them should be dismissed because Plaintiffs have not identified precisely what roles they played within the firmament of LaSalle entities operating the facilities. On the other, the official-capacity defendants, by claiming that their official-capacity identities "merge" with LMC and LCC, effectively argue that those entities are the *only* entities with potential responsibility in this case and are the *only* the entities to which the individuals' official-capacity claims attach. The defendants cannot have it both ways. Their position is also notable for the fact Plaintiffs have been attempting to identify these other corporate entities through discovery and have been forced to file a motion to compel with the Court in the face of resistance by the defendants' same counsel. *See* Pl. Mot. Compel, ECF 58 at 7-9. The defendants' "duplicative" argument here smacks of the type of effort by LaSalle to evade liability that multiple courts have rejected in the past.

In sum, the defendants' various corporate-form arguments are unavailing. Plaintiffs have named the correct *Monell* defendants and the Complaint's allegations against them are sufficient at the pleading stage. Further investigation into their specific identities can, should, and is occurring through discovery. The Complaint's allegations are enough.

---

Medical Director and the medical director at the Olla facility where Mr. Anderson was held. *See* ECF 1 ¶ 23. In *Wooten*, the district court noted that Dr. Hearn was the "Medical Director at Correctmed, LLC," and that the employment of all medical staff of at least one LaSalle facility "was transferred to Correctmed." 2025 WL 961435 at *13. Nevertheless, *Wooten* reported, Dr. Hearn is still employed from LaSalle's headquarters in Ruston, Louisiana, and is "responsible for the medical operations and deployment of health resources to support a number of medical facilities" are operated by LaSalle. *Id.* "Correctmed LLC," to name just one LaSalle entity, thus may be an additional entity-defendant in this case.

28

**D.        The Complaint adequately alleges claims against the supervisor defendants.**

Count II of the Complaint, ECF 1 at 30, is an individual capacity claim for supervisory liability against Clay and William McConnell, who both own and oversee the operations of the LaSalle companies, *id.* ¶¶ 18-19, 143-44; Dr. Pamela Hearn, who is medical director for the LaSalle companies, *id.* ¶ 23; and John Stuckey, who is warden of the facility where Mr. Anderson was confined. *Id.* ¶ 20.  The count alleges that within LaSalle facilities there were observed policies and customs pursuant to which detained people received inadequate medical care that caused Mr. Anderson's death, *id.* ¶¶ 169, 172, and that the supervisor-defendants, who supervised the LaSalle employees who caused Mr. Anderson's death, were aware of but indifferent to those same policies, thereby adopting and encouraging the provision of inadequate medical care to people detained by LaSalle.  *Id.* ¶¶ 167-68, 170-71. The supervisor-defendants make several arguments to defeat these claims, but none of their contentions withstand scrutiny.

*First*, Clay and William McConnell devote much of their brief to countering a veil-piercing claim, contending that their status as owners, alone, is insufficient to establish liability in light of the protections afforded to limited liability companies.  ECF 74-1 at 5-9.  At the pleading stage, that argument should be rejected.  The McConnells are correct that the Complaint does not allege the McConnells have engaged in fraud or a breach of professional duty as the McConnells use those terms, *cf. id.* at 7-8.  The McConnells are incorrect, however, that the Complaint fails to allege the McConnells committed a negligent or wrongful act, *cf. id.* at 8-9. The McConnells acknowledge the Complaint alleges that

> the McConnell Defendants are "owners" of the LaSalle branded Entities; exercise policymaking and ultimate control over the LaSalle-branded Entities; are aware of the policies and practices of the LaSalle-branded Entities; turned the blind eye, were indifferent to, and tacitly encouraged the policies of the LaSalle-branded Entities; and are supervisors of one or more persons who allegedly violated Mr. Anderson's rights.

29

ECF 74-1 at 8-9.  The McConnells say that this is not enough, however because "Plaintiffs have not pled any factual support for those conclusory allegations," *id.* at 9, nor does the Complaint contain allegations that could "indicate the McConnell Defendants were acting outside their capacity as alleged owners of the limited liability companies."  *Id.*

Here, the defendants have not met their burden of presentment at the Rule 12(b)(6) stage. The Complaint's allegations that the McConnells are supervisors and exercise control over LaSalle's operations is factual in nature—Plaintiffs are aware of no case law suggesting that more facts are required to be pleaded to establish supervisory authority, and the defendants point to none.  What the defendants have offered instead are "conclusory statements insufficient to support dismissal," *Cantu*, 2021 WL 2636017, at *1, *supra*, a rule particularly apt at the pleading stage.  Indeed, it is unclear what factual allegation might be missing to sufficiently allege that the McConnells exercise supervisory authority over the LaSalle companies.  The McConnells' argument to the contrary, at the pleading stage, should be rejected, and their argument that Plaintiff has not pierced any corporate veil is irrelevant to Plaintiff's supervisory liability claims.

*Second*, all the supervisor-defendants (the McConnells, plus Hearn and Stuckey) make a related argument:  acknowledging that the Complaint identifies them as supervisors for purposes of establishing supervisory liability, the defendants all argue that the Complaint contains insufficient facts to support its allegations that they were, as supervisors, aware of the widespread practices within LaSalle of providing inadequate medical care to people whom LaSalle had detained.  *See* ECF 74-1 at 14 (Plaintiffs allege that the McConnell Defendants were aware of and indifferent to an alleged policy of providing inadequate medical care. However, those threadbare allegations are insufficient to show the McConnell Defendants were deliberately indifferent in maintaining an unconstitutional policy."); ECF 75-1 at 7 ("Plaintiffs

30

allege that Mr. Stuckey and Dr. Hearn were aware of the 'policies and practices' at the facility and tacitly approved them. Plaintiffs further allege that Mr. Stuckey and Dr. Hearn, as supervisors, 'adopted and/or failed to adopt' policies that 'encouraged or were indifferent to the provision of inadequate medical care.' Beyond those conclusory allegations, Plaintiffs do not allege any other actions or inactions of Mr. Stuckey or Dr. Hearn that would serve as factual support for the individual capacity claims.").

Plaintiffs understand this argument to be that the Complaint fails to allege facts showing exactly how the supervisor-defendants were aware of the widespread practices set out in the Complaint. But this simply misunderstands the law. Deliberate indifference in the supervisory context requires either actual or constructive knowledge of violations. *Yara v. Perryton Indep. Sch. Dist.*, 560 F. App'x 356, 360 (5th Cir. 2014). In turn, "[c]onstructive knowledge *may be inferred* from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." *Pineda*, 291 F.3d at 330 n.15 (emphasis added). Here, the Complaint alleges a set of unconstitutional practices within LaSalle that were persistent and widespread from which knowledge on the parts of the McConnells, Hearn, and Stuckey may permissibly be inferred. Plaintiffs have set out those allegations *supra*. At the pleading stage, that is enough.

It is for this reason, too, that the supervisor-defendants' "group pleading" argument is unavailing. The supervisor-defendants argue that the Complaint impermissibly uses group pleading, since it does not specify which supervisor failed to do what. *See* ECF 74-1 at 13. But none of the supervisor-defendants was personally involved in Mr. Anderson's care, such that separate allegations would be required to explain what each defendant did or did not do regarding his condition. Instead, the supervisors are charged with constructive knowledge of

31

unconstitutional practices that are widespread. *Pineda*, 291 F.3d at 330 n.15.  The Complaint's charge is that *all* the supervisor-defendants, charged with this constructive knowledge of LaSalle's practices, were indifferent to the widespread practice of inadequate medical care in that they did nothing to stop it.  The defendants offer no authority for the proposition that that same indifference allegation mut be repeated for each supervisor-defendant. Each of the supervisor-defendants will have no trouble understanding the claims made against them.

*Third,* the defendants argue that the Complaint fails to allege sufficient facts to make out a claim for failure to train.  *See* ECF 73-1 at 11-12.  Like the defendants' general *Monell* arguments, this claim is premised on the contention that "[t]o successfully plead a claim for failure to train, Plaintiffs must plead a pattern of similar constitutional violations by untrained employees." *Id.* at 11.  And the defendants, citing to their arguments about insufficient incidents generally, claim that there are simply not enough incidents to make out a claim in this case either.  *Id.*  As Plaintiffs have set out *supra*, however, the Complaint *does* adequately allege a pattern and practice of providing inadequate medical care to people detained by LaSalle, with catastrophic results.  At the pleading stage, that is enough.

**E.    The Complaint's state-law claims should not be dismissed.**

The moving defendants all seek to have the state law claims against them, set out in Count IV of the Complaint (*see* ECF 1 at 32, ¶¶ 181-86), dismissed.  *See* ECF 73-1 at 12-13; ECF 74-1 at 14-16; ECF 75-1 at 8-10.  Their common argument is that while the Complaint asserts a state law claim that the defendants' wrongful conduct harmed Mr. Anderson, the Complaint cites no facts in support.  *Id.*  This argument conspicuously ignores paragraph 181 of the Complaint, which states:  "Plaintiffs incorporate all previous paragraphs [of the Complaint] as if fully restated here."  ECF 1 ¶¶ 181. Those previous paragraphs incorporate all the misconduct against each of the defendants that is alleged throughout the Complaint.

32

Such incorporation paragraphs are a ubiquitous device in pleadings, and it fell to defendants to account for the incorporation paragraph and explain why the allegations it incorporated were insufficient to state a claim under state law. Defendants have the burden in this Rule 12 motion, and as Plaintiffs noted *supra*, courts "may find conclusory statements insufficient to support dismissal under Rule 12(b)(6), especially when the movant *disregards relevant portions of the operative pleading*." *Cantu*, 2021 WL 2636017, at *1 (emphasis added). It was the defendants' burden to explain why the incorporation language in Paragraph 181 was insufficient or inoperative, but instead each of the defendants' briefs disregards the language. The request to dismiss Plaintiffs' state law claims should be denied on these grounds alone. Alternatively, the body of the Complaint, which is what Paragraph 181 incorporates, amply sets out wrongdoing by the defendants, as Plaintiffs have explained throughout this brief.[7]

### F.    The Complaint adequately alleges claims against Defendant Gwen Warren.

Defendant Gwen Warren was one of the LaSalle healthcare personnel who interacted with Mr. Anderson and, the Complaint alleges, was indifferent to his medical needs. ECF 1 at ¶¶ 26, 43-46. The defendants make two arguments for her dismissal. First, they argue that the complaint has not sufficiently alleged that Ms. Warren, an LPN, was indifferent to Mr. Anderson's serious medical needs because "[t]he only involvement Gwen Warren is alleged to have in the events giving rise to this lawsuit is responding to the initial 'code blue.' " ECF 75-1 at 9. That is not all the complaint alleges, however. As set out *supra*, Plaintiffs additionally allege that Ms. Warren noted that during his seizure Mr. Anderson had urinated on himself, ECF 1 ¶ 43, yet she did not try to provide any care to him, did not attempt to obtain an assessment or

---

[7]    While the state law claims should not be dismissed, Plaintiffs do agree with the defendants that punitive damages are not available for the state law claims in this case.

33

diagnosis for the cause of the seizure, and did not attempt to alert a practitioner about the seizure. *Id.* ¶¶ 44-46.  The defendants do not acknowledge these allegations, and do not explain why they do not state a plausible claim of indifference.  These are not grounds for dismissal.

The defendants also note, correctly, that Ms. Warren's name was omitted from Count III, against the individual, non-supervisory defendants in their individual capacities, and seek her dismissal on that basis.  ECF 75-1 at 6.  The omission of Ms. Warren from Count III was a scrivener's error and not grounds for dismissal.  Importantly Ms. Warren is named in the caption of the complaint, and the factual allegations against her are set out in the body of the complaint *see*.  Ultimately, the Complaint names Warren as a defendant and sets forth a "short and plain statement" describing her misconduct that is sufficient to show that Plaintiffs are entitled to relief.  *Cf.* Rule 8(a)(2).  Ultimately Ms. Warren's inadvertent omission can be remedied through the filing of an amended complaint to correct the omission, and to the extent the Court finds that the Complaint's allegations are insufficient to state a claim against Ms. Warren because of the omission, Plaintiffs respectfully request leave to amend the Complaint.

## CONCLUSION

For the foregoing reasons the defendants' motion should be dismissed.  To the extent that the Court concludes that the Complaint contains insufficient factual allegations, however, Plaintiffs respectfully submit that the Court should issue any dismissal order without prejudice in order to afford Plaintiffs an opportunity to cure any pleading defects identified in the Complaint. Doing so would be consistent with the spirit of Rule 15(a)(2), which provides that courts should "freely give leave [to amend pleadings] when justice so requires."

34

Date: May 29, 2026                          Respectfully Submitted,

/s/ _Aaron N. Maples_                        /s/ _Sam Harton_

Aaron N. Maples                             **Romanucci and Blandin, LLC** Antonio
Brendan Connick                             Romanucci (pro hac vice)
**Maples & Connick**                        Stephen Weil (pro hac vice)
733 Dante Street, Suite H New Orleans,      Sam Harton (pro hac vice)
LA 70118                                    Colton Johnson Taylor (pro hac vice)
Tel: 504-269-3870                           321 N. Clark St.
aaron@maplesconnick.com                     Chicago, IL 60654
brendan@maplesconnick.com                   Tel: (312) 458-1000
                                            Fax: (312) 458-1004
                                            aromanucci@rblaw.net
                                            sweil@rblaw.net
                                            sharton@rblaw.net

                                            _Attorneys for Plaintiffs_